
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  34710-9-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ALEXANDER TRAVIS JOHNSON, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — A jury found Alexander Johnson guilty of harassment, second

degree assault, malicious harassment, and third degree malicious mischief.  On appeal,

Johnson challenges evidentiary rulings, the performance of his trial counsel, the trial

court's handling of his unannounced absence from trial, and the objectivity of a juror.

We find error in one evidentiary ruling but deem the error harmless.

FACTS

This prosecution concerns the relationship between defendant Alexander Johnson

and victim Eric Leggett, occupants of adjoining apartment buildings in downtown

Spokane.  Alexander Johnson is the significant other of Noelle Beck.  Noelle Beck

resided at 319 Cornerstone Courtyard Apartments (Cornerstone) in Spokane, operated by

the Spokane Housing Authority. Beck's apartment lay on the third floor of the apartments, with windows facing Adams Street and a side alley.

Alexander Johnson regularly stayed in Noelle Beck's apartment despite being an unauthorized guest. Rules promulgated by the Spokane Housing Authority barred unauthorized guests from staying beyond fourteen days. Johnson, with the assistance of the Cornerstone manager Melanie Kurtzhall, applied to the housing authority to add his name to Beck's lease. The housing authority denied Johnson's application.

Eric Leggett occupied a first floor unit in an apartment building adjoining Cornerstone. Presumably because of Leggett's and Alexander Johnson's smoking habits, the two became acquainted when smoking cigarettes on the sidewalk adjoining the two apartment buildings. During these respites, the two discussed many topics, including politics and religion.

The cordial relationship between Eric Leggett and Alexander Johnson deteriorated when Leggett told Johnson he was gay and HIV positive. Thereafter and on March 20, 2016, Leggett found four threatening notes taped to his apartment window. The first note read: "'Wish for a quick death to,'" "'Eric.'" Report of Proceedings (RP) at 276. The second declared: "'To,'" "'Eric, don't fuck with us.'" RP at 278. The third stated: "'To,'" "'Eric,'" "'we will take the man on the couch and your fag friends too.'" RP at 279. The fourth and final note announced: "'To Eric,'" "'Eric, do not disrespect anyone with your comments. You will be hurt and kept alive.'" RP at 280. Leggett reported the

2

menacing messages to Cornerstone manager Melanie Kurtzhall, who advised Leggett to contact the police.

Melanie Kurtzhall reviewed Cornerstone surveillance tapes following her conversation with Eric Leggett. The footage showed Alexander Johnson pacing outside the Cornerstone apartments before placing objects on an exterior window of the adjoining building and walking away. Kurtzhall also called the police who investigated and took possession of the notes.

On April 12, 2015, Eric Leggett heard a sporadic tapping noise, like the sound of pebbles, at his window. Leggett exited his apartment, checked the alleyway abutting his apartment's ground floor window, and, after seeing no one, returned inside his apartment. The tapping sound resumed, which lured Leggett outside again. A fearful Leggett also called 911. He noticed a crack in his glass window, and, while still on the phone with law enforcement, felt the pop of a bullet hit his skin, which sensation caused him to drop his phone. He deemed his life to be in danger.

Spokane Police Officer Joshua Laiva responded to Eric Leggett's emergency call. Officer Laiva saw a bright red welt on Leggett's ribcage near his armpit with a corresponding projectile hole in his shirt. Leggett told Officer Laiva that the shot originated from the third floor of Cornerstone and that he suspected Alexander Johnson to be the shooter.

Alexander Johnson resided with Noelle Beck on April 12. Beck allowed Officer

Joshua Laiva to view her apartment, although Johnson was absent. Officer Laiva observed windows on the south wall of the apartment. One window was open one inch and its blinds pushed to the left. Officer Laiva also noticed Eric Leggett's window was broken, the window screen had a hole from a projectile, and the window framing had been damaged. Laiva concluded that the damage to Leggett's window came from a projectile moving at a downward angle.

Melanie Kurtzhall viewed security footage again after learning of Eric Leggett's injury. Kurtzhall saw Alexander Johnson exiting and entering Cornerstone. Once inside Noelle Beck's apartment, Johnson peered out a window while holding a rifle. While outside, Johnson paced on the sidewalk. A caseworker for tenants at Cornerstone, Angel Willson, also saw Johnson that day with a rifle.

Later on April 12, Melanie Kurtzhall noticed Alexander Johnson sitting in his car outside Cornerstone. Johnson motioned as if shooting an imaginary gun at Kurtzhall. A frightened Kurtzhall returned inside Cornerstone.

On the evening of April 12, Jack Swanstrom visited his girlfriend's apartment at Cornerstone. Swanstrom saw Alexander Johnson bearing a rifle. Johnson previously told Swanstrom he believed Eric Leggett had flirted with him, which purported seductive behavior bothered Johnson.

Spokane County Detective Randy Lesser reviewed Cornerstone security footage and saw on the videotape Alexander Johnson, fourteen minutes before Eric Leggett's

4

injury, walking around the apartments with a pellet gun.  Detective Lesser questioned

Johnson several days after the shooting.  Johnson denied shooting Leggett, but admitted

to owning a pellet gun, which law enforcement seized.  Johnson acknowledged to Lesser

that he knew of Leggett's homosexuality.

PROCEDURE

The State of Washington charged Alexander Johnson with felony harassment,

second degree assault, malicious harassment, and third degree malicious mischief.

Most of the issues on appeal concern trial procedure.  Trial commenced on June

20, 2016.  The first day of trial involved jury selection and a hearing to admit Alexander

Johnson's statements to law enforcement.  The following exchange occurred, during voir

dire, between the State's attorney and prospective juror two:

> [Prosecutor]: One of the things that [defense counsel] talked about
> was having evidence to prove something and believing in something.  And
> I can't remember whether it was juror No. 5—sorry, you would think I
> could remember ten minutes ago, but if—and I'll ask juror No. 2.  If I
> present evidence to you to prove a proposition and the evidence does prove
> that proposition, can you believe that?
> JUROR NO. 2: Yes.  I have faith that you are giving us the truth and
> that the evidence that you're giving us is reliable, that the evidence that this
> party would give is reliable, so I would say if evidence is presented in
> court, I would believe it.

RP at 123-24.  No one asked juror two any further questions on this same subject.

Defense counsel exercised no challenges for cause and no peremptory challenges.  Juror

two served on the jury.

On the second day of trial, Alexander Johnson was present when the court convened in the morning. The trial court recessed around 9:45 a.m. for five minutes, which recess Johnson used for a restroom break. Johnson did not return to the courtroom thereafter. For the next half hour, defense counsel phoned Johnson to inquire of his location. Law enforcement also searched for Johnson to no avail. The State informed the trial court of a desire to continue with the trial nonetheless. No witnesses had yet to testify.

The trial court issued a bench warrant for Alexander Johnson's arrest. The court then commented:

His absence does appear to be voluntary on the face but I suppose there could be an explanation that we're otherwise unaware of. I'll give him the benefit of the doubt but if he's not here at 1:30 and we haven't otherwise located him in an emergency setting . . . it's inconvenient to our jurors but I don't want to have to try this case again. We don't need to declare a mistrial, which is my first concern.
. . . .
So again, Counsel, I apologize for the inconvenience, but I guess in fairness it's not my fault. It's not your fault, and [defense counsel], just so we have a clear record . . . I would be surprised if we locate [Johnson] in an emergency room or someplace else. I think he's just trying to avoid being here for whatever reason . . . but that's besides the point. If he shows up, and if he doesn't, we'll go forward without him at 1:30.

RP at 229-231. Following this colloquy, the court recessed for the remainder of the morning and the noon hour. When the court reconvened in the afternoon, the trial court remarked:

6

[F]irst of all . . . in this case [Alexander Johnson] is not just late or delayed and whether he's truly just not coming back, and we'd been waiting since thereabouts 10:00 this morning. It is now about 20 minutes to the hour, 20 minutes to 2:00 in the afternoon. Seems pretty clear to me [Johnson] isn't going to return and during our recess we checked the local hospitals. Might seem like an exercise in silliness but just to be sure that Mr. Johnson wasn't there, and we also checked our jail roster in case in some fashion he happened to get picked up. No sign of Mr. Johnson anywhere.

We also checked our clerk's office to see if for some reason he might be there. There is no sign of him and I'm satisfied that I've laid down enough of a record, as has counsel, and foundation for us to go forward with the trial without [Johnson] here.

RP at 237-38. Trial then proceeded during the afternoon with opening statements and testimony from some of the State's witnesses.

Cornerstone manager Melanie Kurtzhall testified she felt frightened when Alexander Johnson motioned his finger, as a gun, in her direction. Kurtzhall added that she knew that Johnson had already shot Eric Leggett, which knowledge enhanced her fear.

The State questioned Eric Leggett about who he believed the "shooter" to be:

[DEPUTY PROSECUTOR]: And who was the person you thought responsible for your injuries?
[LEGGETT]: Alex Johnson.
[DEPUTY PROSECUTOR]: Okay. And that's the same Alexander Johnson who you believe put the notes on your window?
[LEGGETT]: Yes, ma'am.
[DEPUTY PROSECUTOR]: Okay. Now, is it because of the incident from March 21 that you believed Mr. Johnson to be responsible for the April 12 incident?
[LEGGETT]: That and the vantage of the – of their apartment, yes, to be able to shoot both the window and me in a different perspective. I

thought it was very likely and I directed the officers to go that direction with their investigation.

RP at 356-57.

The trial court admitted the pellet gun confiscated from Alexander Johnson as an exhibit. Detective Randy Lesser identified the gun as a Crosman Fury NP pellet gun, and he testified that the gun looks like a rifle to the average person. A scope sits on the top of the gun's barrel, and the scope allows the shooter to aim from afar. Detective Lesser averred that warning labels accompany the purchase of the pellet gun. Lesser researched the labels on the manufacturer's Internet website. He read the label warning to the jury:

> "Warning: Not a toy. This air gun is recommended for adult use only. Misuse or careless use may cause serious injury or death. May be dangerous up to 600 yards."
> . . . Police and others may think it is a firearm.
> . . . .
> If you're firing a lead pellet, the velocity is up to 1,000 feet per second. If you're firing an alloy pellet, the velocity is up to 1200 feet per second.

RP at 396-97.

The third day of trial, June 22, 2016, began with more testimony from a State witness without Alexander Johnson present. After only minutes of testimony and with the jury excused, the trial court announced that law enforcement had surrounded a home occupied by Johnson and officers were attempting to garner Johnson's cooperation in returning to the courthouse or seize his person and bring him to the courthouse. The court then recessed for the rest of the morning.

8

By early afternoon, June 22, law enforcement held Alexander Johnson in custody.

At 1:40 p.m., the trial court reconvened, and the court commented:

> It's about 20 minutes to 2:00 and it's the 22nd of June, 2016, and we talked before the break about potential for [Alexander Johnson] to join us again since he's been absent from the trial after we recessed after the jury was selected and he didn't come back but now I understand [Johnson] is in custody. He is actually physically down here on the County property. He is not, as the jail staff just advised me, he is not portable in terms of his appearance, so I guess I just wanted to, Counsel, run it by all of you about procedurally that, to be quite frank, I've never had a situation like this develop yet. I'm not sure if we should go forward right now. I mean I've got jurors waiting or whether we stop and get him over here and he—if he wants to be in the courtroom. I can't have him in the courtroom looking the way I understand he looks based on what the jail has told me.
> . . . .
> He [Alexander Johnson] looks like he's been in a scuffle. Let me put it that way, that's what I understand. His pants are torn up. He's got jail slippers. But then again, the concern I have is . . . arguably he's already indicated his intentions to not be here. Maybe I need to get him over here for him to formally tell us on the record what he would like to do one way or another. If he doesn't want to be here for the rest of the trial, maybe he can waive that appearance on the record.

RP at 437-38. Counsel and the trial court discussed questions surrounding Johnson's return to the courtroom, the physical appearance of Johnson, and the admissibility of evidence of Johnson's absconding.

Law enforcement transported Alexander Johnson to the courtroom that afternoon. The trial judge and Johnson engaged in the following conversation after Johnson's arrival:

> THE COURT: Mr. Johnson, good afternoon.
> [JOHNSON]: Good afternoon.

> THE COURT: Sir, I just wanted to verify you had a chance to speak with [defense counsel], correct?
> [JOHNSON]: Yes, sir.
> THE COURT: And have you made a decision, sir, that you would like to remain in the courtroom for the balance of the trial?
> [JOHNSON]: Yes, sir.
> THE COURT: Okay. And you feel that's a decision you made after being fully advised by [defense counsel] regarding your rights? To remain in the trial?
> [JOHNSON]: Yes.
> THE COURT: Okay. And, sir, you do understand that [defense counsel] explained to you, you do have a right not to be present at trial if you want, as long as you make a knowing and voluntary waiver of that. But so I'm clear, sir, your determination is you would like to stay, you would like to participate in the trial and be here, correct?
> [JOHNSON]: Correct.

RP at 446-47.

With Alexander Johnson present, Detective Randy Lesser completed his testimony. Johnson called no witnesses and the trial recessed for the third day.

On the fourth day, counsel delivered their respective summations. Defense counsel commented:

> The State talked about the weapon [pellet gun] as a firearm. It does fire a projectile. The State talked about the foot-per-second velocity of whether it's a lead pellet or an alloy pellet. We know that where the window was shot there are some of what [Eric Leggett] believes were the pellet but the detective says, you know, he can't tell. Was it lead at 1,000 feet per second or an alloy at 1200 feet [per] second . . . .
> The State also talked to you about that the weapon may be dangerous up to 600 yards. The distance here is shorter than 600. I don't think anybody would argue that. The quote she had was that "it may be dangerous up to 600 yards." Not deadly, may be. At one point it can possibly cause death under the circumstances in which it is used. But it doesn't say what those circumstances were.

10

> I think you have to look at the day that this assault allegedly took place. There are assumptions that the shot came from apartment 319, which is the residence of [Noelle Beck] and [Alexander Johnson]. There's no indication at the time that the shot, and this was testimony, who was in the apartment.

RP at 540-41. The jury found Alexander Johnson guilty of all four crimes charged: felony harassment, second degree assault, malicious harassment, and third degree malicious mischief.

At the sentencing hearing, the State mentioned that it had filed bail jumping charges against Alexander Johnson because of his absence from some of the trial. The State also commented that the sentencing court could consider Johnson's absconding from the courtroom when sentencing. During the hearing, the court afforded Johnson an opportunity for allocution. The sentencing court did not ask Johnson to explain his absence, however. Johnson declined to render any statement.

LAW AND ANALYSIS

Juror Bias

*Issue 1: Does Alexander Johnson show actual bias of juror two?*

*Answer 1: No.*

On appeal, Alexander Johnson first assigns error to the trial court's failure to remove juror two from jury service and his trial counsel's failure to object to the seating of juror two. Johnson contends that juror two's response to a question during voir dire showed actual bias against him because the juror declared he or she would believe the

11

State's evidence. We previously quoted the colloquy between the State's attorney and juror two but repeat it here, because of the critical nature of the precise comments:

> [Prosecutor]: One of the things that [defense counsel] talked about was having evidence to prove something and believing in something. And I can't remember whether it was juror No. 5—sorry, you would think I could remember ten minutes ago, but if—and I'll ask juror No. 2. If I present evidence to you to prove a proposition and the evidence does prove that proposition, can you believe that?
> JUROR NO. 2: Yes. I have faith that you are giving us the truth and that the evidence that you're giving us is reliable, that the evidence that this party would give is reliable, so I would say if evidence is presented in court, I would believe it.

RP at 123-24.

The State understandably asked juror two if the juror would accept a proposition if the State proved the proposition. The question indirectly sought to determine if the juror would acquit the defendant despite the State proving all of the elements of the crime. The question thereby searched for bias against the prosecution. The question did not query the juror as to whether he or she will accept all of the evidence presented by the State as the truth. The question did not ask if the juror will accept the evidence of the State regardless of whether Alexander Johnson presents conflicting evidence or regardless of whether Johnson presents no evidence.

Juror two's answer journeyed beyond the State's question. In addition to the juror affirming that he or she would convict if the State proved the elements of the crime, the juror disclosed that he or she would accept all State's evidence as the truth. This

12

disclosure would suggest bias in favor of the State, but the juror did not end his or her answer there. The juror also stated that she or he would deem all evidence presented by "this party" as reliable. RP at 124. The juror did not name to whom "this party" referred. Nevertheless, we suspect "this party" references Alexander Johnson, since the juror already mentioned that she or he would accept the evidence presented by the State as dependable, and the trial involved no other party beside Johnson.

The unique response of juror two raises the question of whether a juror holds actual bias if the juror impliedly states that he or she will consider the State's evidence as the truth if the defendant presents no countervailing evidence. The juror answer suggests that the juror will, contrary to constitutional principles, ignore a presumption of innocence and require the defendant to bear a burden of producing evidence in order to acquit himself rather than demanding that the State prove its case beyond a reasonable doubt. Neither party addresses this nuance in his or its briefing.

Alexander Johnson contends that juror two's statement reveals actual bias. The Sixth and Fourteenth Amendments to the United States Constitution, as well as article I, section 22 of the Washington Constitution, guarantee a criminal defendant the right to trial by an impartial jury. *Taylor v. Louisiana*, 419 U.S. 522, 526, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975); *State v. Davis*, 175 Wn.2d 287, 312, 290 P.3d 43 (2012). The right to trial by jury means a trial by an unbiased and unprejudiced jury. *State v. Stackhouse*, 90 Wn. App. 344, 350, 957 P.2d 218 (1998). Even one biased juror denies the accused a

13

constitutional right to an impartial jury. *State v. Irby*, 187 Wn. App. 183, 192-93, 347

P.3d 1103 (2015), *review denied*, 184 Wn.2d 1036, 379 P.3d 953 (2016). If the potential

juror demonstrates actual bias, the trial court must excuse the juror for cause. *State v.*

*Fire*, 100 Wn. App. 722, 726, 998 P.2d 362 (2000), *reversed on other grounds by* 145

Wn.2d 152, 34 P.3d 1218 (2001).

Two Washington statutes address juror bias. RCW 4.44.170(2) defines actual

bias:

> For the existence of a state of mind on the part of the juror in
> reference to the action, or to either party, which satisfies the court that the
> challenged person cannot try the issue impartially and without prejudice to
> the substantial rights of the party challenging, and which is known in this
> code as actual bias.

RCW 4.44.190 reads:

> A challenge for actual bias may be taken for the cause mentioned in
> RCW 4.44.170(2). But on the trial of such challenge, although it should
> appear that the juror challenged has formed or expressed an opinion upon
> what he or she may have heard or read, such opinion shall not of itself be
> sufficient to sustain the challenge, but the court must be satisfied, from all
> the circumstances, that the juror cannot disregard such opinion and try the
> issue impartially.

Under the Washington statutes, even if a juror has a preconceived idea, such

opinion shall not disqualify the juror unless the court is satisfied, from all the

circumstances, that the juror in reference to the action or to either party cannot disregard

such opinion and try issues impartially. *State v. Lawler*, 194 Wn. App. 275, 281, 374

P.3d 278, *review denied*, 186 Wn.2d 1020, 393 P.3d 1027 (2016). Stated differently, the

14

juror will be excused for cause if his or her views would prevent or substantially impair the performance of his or her duties as a juror in accordance with his or her instructions and his or her oath. *State v. Hughes*, 106 Wn.2d 176, 181, 721 P.2d 902 (1986).

"Actual bias" must be established by proof. *Brady v. Fibreboard Corp.*, 71 Wn. App. 280, 283, 857 P.2d 1094 (1993). A defendant must prove actual bias. *State v. Noltie*, 116 Wn.2d 831, 838, 809 P.2d 190 (1991). A defendant must show more than a mere possibility that the juror was prejudiced to successfully challenge the trial court's decision on appeal. *State v. Noltie*, 116 Wn.2d at 840; *State v. Grenning*, 142 Wn. App. 518, 540, 174 P.3d 706 (2008), *aff'd*, 169 Wn.2d 47, 234 P.3d 169 (2010). A juror's "equivocal answers alone" do not justify removal for cause. *State v. Noltie*, 116 Wn.2d at 839. The appropriate question is "whether a juror with preconceived ideas can set them aside" and decide the case on an impartial basis. *State v. Noltie*, 116 Wn.2d at 839.

Many Washington decisions address whether the trial court should have excused a venire person for actual bias. We mention three of the decisions where a court answered the question in the affirmative: *State v. Irby*, 187 Wn. App. at 192 (2015); *State v. Gonzales*, 111 Wn. App. 276, 45 P.3d 205 (2002), and *State v. Fire*, 100 Wn. App. 722.

In *State v. Irby*, the potential juror in a murder prosecution remarked that she might favor the prosecution because of her work in Child Protective Services. The prosecutor then asked, "[w]ould that impact your ability to be a fair and impartial juror? Do you think you could listen to both sides, listen to the whole story so to speak?" *State*

*v. Irby*, 187 Wn. App. at 190. The potential juror responded, "I would like to say he is guilty." *State v. Irby*, 187 Wn. App. at 190. The court sat the juror absent objection, and this court found manifest constitutional error requiring a reversal of all convictions.

In *State v. Gonzales*, 111 Wn. App. 276 (2002), the juror stated she, based on her upbringing, deemed law enforcement officers honest and straightforward. According to the juror, she would believe a law enforcement officer would tell the truth unless proven otherwise and would encounter difficulty deciding against the testimony of an officer. When told that the court might instruct her to presume the defendant as innocent, the juror responded that she did not believe she could follow this presumption.

In *State v. Fire*, 100 Wn. App. 722 (2000), the challenged juror stated, "'I consider him [defendant charged with child molestation] a baby raper, and it should just be severely punished.'" *State v. Fire*, 100 Wn. App. at 728. The juror added: "I'm very opinionated when it comes to this kind of crime." *State v. Fire*, 100 Wn. App. at 728. The potential juror, who served on the panel, also admitted that his strong feelings about this kind of case could affect his determination of guilt or innocence, in light of his belief in the innocence of children and the relative lack of credibility of adults.

With some reluctance, we hold that Alexander Johnson fails to show actual bias in juror two. Because juror two's answer to the prosecution's question suggests the juror might not challenge the State's evidence if Johnson presented no evidence, we wish the juror would have been questioned further. Nevertheless, the juror, uneducated in the law,

16

had not yet been instructed by the trial court as to the presumption of innocence or the

State's burden of proving the crime beyond a reasonable doubt. Most potential jurors at

the outset of a trial trust that evidence presented will be truthful. Cross-examination of

witnesses and argument of counsel dispel this notion. The voir dire question and answer

tell us little about the mental state of the juror and whether he or she could be impartial to

the parties and the nature of the charges. The record lacks a showing that juror two could

not put aside any bias and fairly decide the case on the facts and the law.

In short, Johnson has failed to carry his burden of showing prejudice. Johnson

presents no decision directly on point. Juror two never stated she would believe officers'

testimony over other witness testimony. The juror never commented that the defendant

bore a presumption of guilt. The juror never mentioned a predisposition about the nature

of the charges.

*Issue 2: Did trial defense counsel perform ineffectively by failing to seek to*
*remove juror two for cause?*

*Answer 2: No.*

Alexander Johnson also claims his trial counsel was ineffective because he did not

challenge juror number two for bias or for cause. Since we hold that Alexander Johnson

shows no bias, we need not address this assignment of error. Johnson does not argue that

trial counsel should have exercised a preemptory challenge to remove juror two.

17

Johnson Absence from Trial

*Issue 3: Did the trial court err when failing to expressly ask Alexander Johnson, before sentencing, as to his reason for being absent from a portion of the trial?*

*Answer 3: No, since the trial court afforded Johnson an opportunity to allocate during sentencing.*

Alexander Johnson contends the trial court failed to protect Johnson's constitutional right to be present at trial. Johnson assigns error to the trial court's failure to inquire whether he voluntarily waived his constitutional right. We disagree because the trial court afforded Johnson an opportunity to explain his absence.

An accused possesses a fundamental constitutional right to be present during trial. *State v. Thomson*, 123 Wn.2d 877, 880, 872 P.2d 1097 (1994). The right derives from Washington Constitution article I § 22, which provides: "the accused shall have the right to appear and defend in person, or by counsel . . . [and] to meet the witnesses against him face to face." *State v. Thomson*, 123 Wn.2d at 880 (alterations in original). The right to be present accrues at every critical stage of the proceedings and includes trial testimony. *State v. Irby*, 170 Wn.2d 874, 880, 246 P.3d 796 (2011).

The accused may waive the right to be present during trial. *State v. Garza*, 150 Wn.2d 360, 367, 77 P.3d 347 (2003); *State v. Thomson*, 123 Wn.2d at 880. Any waiver must be voluntary and knowing. *State v. Thomson*, 123 Wn.2d at 880. Once trial has begun in the defendant's presence, a subsequent voluntary absence operates as an implied

18

waiver, and the trial may continue without the defendant. *State v. Garza*, 150 Wn.2d at 367.

In line with constitutional principles and case law, CrR 3.4 reads:

> **(a) When Necessary.** The defendant shall be present at the arraignment, at every stage of the trial including the empaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by these rules, or as excused or excluded by the court for good cause shown.
> **(b) Effect of Voluntary Absence.** The defendant's voluntary absence after the trial has commenced in his or her presence shall not prevent continuing the trial to and including the return of the verdict. A corporation may appear by its lawyer for all purposes. In prosecutions for offenses punishable by fine only, the court, with the written consent of the defendant, may permit arraignment, plea, trial and imposition of sentence in the defendant's absence.
> **(c) Defendant Not Present.** If in any case the defendant is not present when his or her personal attendance is necessary, the court may order the clerk to issue a bench warrant for the defendant's arrest, which may be served as a warrant of arrest in other cases.

When the accused disappears during trial, Washington Supreme Court precedent directs the trial court to engage in a three-step process: (1) inquire, in the defendant's absence, of the circumstances of his or her disappearance, (2) render a preliminary finding of voluntariness, if justified, and (3), if and when the accused reappears, afford the defendant an adequate opportunity to explain his absence before imposing sentence. *State v. Garza*, 150 Wn.2d at 367 (2003). The third prong of the analysis provides an opportunity for the defendant to explain his or her disappearance and rebut the finding of voluntary absence before the proceedings have been completed. *State v. Thurlby*, 184

Wn.2d 618, 630, 359 P.3d 793 (2015); *State v. Thomson*, 123 Wn.2d at 883.

Nevertheless, the third prong does not shift the burden to the State to prove the voluntary

nature of the absence. *State v. Garza*, 150 Wn.2d at 368.

In performing the three-step analysis, the court indulges every reasonable

presumption against waiver. *State v. Garza*, 150 Wn.2d at 367-68. This presumption

may conflict with the concept of an implied waiver of the right to be present if the

defendant voluntarily absents himself during trial.

We review a trial court's decision regarding a criminal defendant's voluntary

absence for abuse of discretion. *State v. Garza*, 150 Wn.2d at 365-66. Alexander

Johnson attended the first day of trial. Johnson could not be found after a recess on the

second day of trial. Defense counsel called several of Johnson's known phone numbers

to no avail. Following a deliberation on how to navigate the circumstances, including

consideration of CrR 3.4 and *State v. Thurlby*, the trial court authorized a bench warrant

for Johnson's arrest. The trial court also commented that officers would search hospitals

and emergency rooms in an effort to determine if Johnson had an explanation for his

disappearance. The trial court waited an additional three hours for Alexander Johnson to

return. The next day, June 22, law enforcement located Johnson and arrested him

pursuant to his bench warrant. Upon his return, the trial court apprised Johnson of his

right to be absent, and also requested Johnson remain respectful, which he agreed to do.

During sentencing, defense counsel advised the trial court that the State recently charged Alexander Johnson with bail jumping. The State also informed the sentencing court that Johnson's absence from trial constituted a sentencing factor. The court advised Johnson of his right to speak and afforded Johnson an opportunity to comment. Johnson declined the invitation. The State believes Johnson offered no explanation at this juncture at the behest of counsel and to prevent self-incrimination.

The totality of the circumstances confirm that Alexander Johnson voluntarily waived his right to be present. Johnson informed counsel he was going to use the restroom, and without warning, left the courthouse. Johnson failed to respond to or answer any of the numbers he had provided to his attorney. The court waited hours for Johnson to return, calling local hospitals and jails, presuming his absence was involuntary. Law enforcement eventually found Johnson at a Spokane house.

We prefer that the trial court specifically mention to the accused of the right to explain his absence, but we do not determine the specific mention to be constitutionally required under these circumstances. The court allowed Johnson an opportunity to speak on Johnson's return to the court and during sentencing. He could have then complained about the continuation of his trial in his absence and presented a valid reason for the absence. His counsel could have also asked for a new trial if Johnson held a valid reason for his absence.

In *State v. Thomson*, 123 Wn.2d 877 (1994), Christopher Thomson absented himself from his trial on delivery of cocaine. He never reappeared during the trial but presented himself at sentencing. The record does not show the trial court's expressly offering Thomson the opportunity to speak about his absence. Nevertheless, Thomas apologized for his absence at trial without further explanation. The Washington Supreme Court affirmed the trial court's ruling that Thomson's disappearance was voluntary.

We distinguish Alexander Johnson's circumstances from the defendant's situation in *State v. Garza*, 150 Wn.2d 360 (2003). Law enforcement arrested Benjamin Garza in Snohomish County while in route to his trial in King County. Garza allegedly told arresting officers that someone needed to alert King County of his absence, but no one contacted the King County superior court judge, who proceeded with trial without any real inquiry. The Supreme Court reversed Garza's conviction.

Because we conclude the trial court committed no error, we do not address the State's argument that any error was harmless.

Pellet Gun Manufacturer Warning

*Issue 4: Whether defense trial counsel performed ineffectively when failing to object as hearsay to testimony of the pellet gun manufacturer's warning?*

*Answer 4: No.*

Alexander Johnson next asserts ineffective assistance of counsel in regards to his trial defense counsel's failure to object to Detective Randy Lesser's reading to the jury of

the manufacturer's warning on the pellet gun. Lesser found the warning on the pellet gun

manufacturer's website. The State concedes the reading of the warning constituted

hearsay. The State argues that defense counsel did not object to use of the warning as

part of trial strategy.

To establish ineffective assistance of counsel, a defendant must satisfy a two-part

test: (1) that his or her counsel's assistance was objectively unreasonable, and (2) that, as

a result of counsel's deficient assistance, he or she suffered prejudice. *Strickland v.*

*Washington*, 466 U.S. 668, 690-92, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To

demonstrate the first prong, deficient performance, a reviewing court adjudges the

reasonableness of counsel's challenged conduct on the facts of the particular case, viewed

as of the time of counsel's conduct. *Strickland v. Washington*, 466 U.S. at 690. This

court gives great deference to trial counsel's performance and begins the analysis with a

strong presumption counsel performed effectively. *State v. West*, 185 Wn. App. 625,

638, 344 P.3d 1233 (2015).

Alexander Johnson argues his trial counsel's failure to object to testimony

prejudiced him. In general, trial strategy and tactics cannot form the basis of a finding of

deficient performance. *State v. Johnston*, 143 Wn. App. 1, 16, 177 P.3d 1127 (2007).

The decision of when or whether to object to trial testimony is a classic example of trial

tactics. *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). Only in

egregious circumstances, on testimony central to the State's case, will the failure to

object constitute incompetence of counsel justifying reversal. *State v. Madison*, 53 Wn.

App. at 763. A criminal defendant can rebut the presumption of reasonable performance

by demonstrating that no conceivable legitimate tactic explains counsel's performance.

*In re Personal Restraint of Caldellis*, 187 Wn.2d 127, 141, 385 P.3d 135 (2016); *State v.*

*Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004).

The State astutely emphasizes instances when defense trial counsel highlighted the

manufacturer's warning during counsel's summation, such that the counsel incorporated

the language of the warnings into part of the trial strategy. Defense counsel referenced

the manufacturer's warning to argue that the pellet gun was not deadly. Counsel also

used information from the warning in an attempt to prove that law enforcement

haphazardly investigated the Cornerstone Apartments the night of the shooting.

Based on trial counsel's remarks during closing, we conclude that the failure to

object to the reading of the gun warning worked as a reasonable tactic. Therefore, we

need not determine whether any failure to object prejudiced Alexander Johnson.

Witness Testimony about Guilt

*Issue 5: Did witness Melanie Kurtzhall or Eric Leggett deliver inadmissible*

*opinion testimony of the guilt of Alexander Johnson?*

*Answer 5: No.*

24

Alexander Johnson contends that Melanie Kurtzhall and Eric Leggett testified to opinions on Johnson's guilt in violation of Johnson's right to trial by jury. Johnson's trial counsel did not object to the testimony.

When the defendant asserts no objection during trial to the challenged evidence, an appellate court reviews for manifest constitutional error. RAP 2.5(a)(3); *State v. Kirwin*, 165 Wn.2d 818, 823, 203 P.3d 1044 (2009). A defendant must identify the error and demonstrate that the alleged improper opinion testimony resulted in actual prejudice and had practical and identifiable consequences. *State v. Kirkman*, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007). Appellate courts will not approve a party's failure to object at trial that could identify error which the trial court might correct. *State v. Kirkman*, 159 Wn.2d at 935. Failure to object deprives the trial court of this opportunity to prevent or cure the error. *State v. Kirkman*, 159 Wn.2d at 935.

No witness may offer testimony in the form of an opinion regarding the guilt or veracity of the defendant because such testimony unfairly prejudices the defendant and invades the exclusive province of the jury. *State v. King*, 167 Wn.2d 324, 332, 219 P.3d 642 (2009). Improper opinions on guilt usually involve an assertion pertaining directly to the defendant. *City of Seattle v. Heatley*, 70 Wn. App. 573, 577, 854 P.2d 658 (1993). Testimony that does not directly comment on the defendant's guilt or on the veracity of a witness and otherwise assists the jury as based on inferences from the evidence does not constitute improper opinion testimony. *City of Seattle v. Heatley*, 70 Wn. App. at 578.

Testimony that is based on inferences from the evidence is not improper opinion testimony. *City of Seattle v. Heatley*, 70 Wn. App. at 578. The fact that an opinion supports a finding of guilt does not make the opinion improper. *State v. Collins*, 152 Wn. App. 429, 436, 216 P.3d 463 (2009).

Admission of witness opinion testimony on an ultimate fact, without objection, is not automatically reviewable as a "manifest" constitutional error. *State v. Kirkman*, 159 Wn.2d at 936. An explicit or nearly explicit opinion on the defendant's guilt can constitute manifest error. *State v. Kirkman*, 159 Wn.2d at 936.

We first review Melanie Kurtzhall's testimony. After the shooting, Alexander Johnson motioned his finger, as if shooting a gun, in Melanie Kurtzhall's direction. During testimony, Kurtzhall stated she knew that Johnson shot Leggett with the pellet gun so she took Johnson's motion as a direct threat that frightened her.

As part of his trial defense, Alexander Johnson claimed that the State could not prove he fired the pellet gun. In turn, the State needed to prove beyond a reasonable doubt that Johnson fired the weapon.

Alexander Johnson knew Melanie Kurtzhall as the manager of Cornerstone. Melanie Kurtzhall knew of the threatening messages to Eric Leggett, and after the shooting, assisted law enforcement with reviewing security camera footage. The jury could infer that Johnson knew that Kurtzhall assisted Leggett and law enforcement. Johnson's threat toward Kurtzhall helped to establish that Johnson fired the pellet gun

26

toward Leggett, because Johnson made a similar shooting motion toward someone who knew of the crime and assisted the victim and law enforcement. The jury could conclude that Leggett shot the pellet gun, because he later sought to intimidate a witness with simulated conduct.

We question whether Melanie Kurtzhall needed to testify that she believed Leggett shot the pellet gun, but we do not consider admission of such testimony manifest constitutional error. Kurtzhall did not directly declare Alexander Johnson guilty. The jury would already have concluded that Kurtzhall considered Johnson the shooter without Kurtzhall declaring her belief.

Alexander Johnson next challenges testimony of Eric Leggett that he considered Johnson to be the shooter. Leggett based this conclusion on the threatening notes on his window and Johnson's vantage point from his window to Leggett's apartment.

We deem *State v. Blake*, 172 Wn. App. 515, 298 P.3d 769 (2012) helpful. On his appeal from a conviction for first degree murder, Jerome Blake argued, in part, that the trial court erroneously allowed testimony of two witnesses who identified him as the shooter without seeing him pull the trigger. Both witnesses testified to their conclusion based on directions from which a flash originated and Blake's positioning. Eric Leggett based his testimony on similar physical evidence.

*Issue 6: Did trial counsel perform ineffectively by failing to object to opinion testimony of Melanie Kurtzhall or Eric Leggett?*

27

*Answer 6: No.*

Alexander Johnson also asserts ineffective assistance of counsel for the failure to object to Eric Leggett's and Melanie Kurtzhall's testimony. We disagree.

We have already concluded the testimony to be proper. Even if objectionable, defense counsel may have tactically decided to not object as to not reemphasize the comment to the jury and because the jury would have already concluded that Kurtzhall and Leggett considered Johnson to be the shooter. The decision to object, or to refrain from objecting, to inadmissible testimony is a tactical decision not to highlight the evidence to the jury. *State v. Kloepper*, 179 Wn. App. 343, 355, 317 P.3d 1088 (2014). The lack of an objection generally does not merit a finding of ineffective assistance of counsel. *State v. Kloepper*, 179 Wn. App. at 355. Johnson fails to show that his counsel performed deficiently.

Johnson as Unauthorized Tenant

*Issue 7: Did the trial court commit reversible error by allowing Melanie Kurtzhall to testify that Alexander Johnson was an unauthorized tenant?*

*Answer 7: No.*

Finally, Alexander Johnson assigns error to the trial court's overruling of his objection to Melanie Kurtzhall's testimony regarding Johnson's status at Cornerstone as an unauthorized guest. Johnson claims this inadmissible testimony painted him as a

scofflaw and raised a forbidden inference that one who breaks the law on one occasion is likely to do it again on a different occasion. We agree.

An appellate court reviews a trial court's ruling on an objection for abuse of discretion. *State v. Magers*, 164 Wn.2d 174, 181, 189 P.3d 126 (2008). Evidence that tends to establish a party's theory, or to qualify or disprove the testimony of an adversary, is always relevant and admissible. *State v. Harris*, 97 Wn. App. 865, 872, 989 P.2d 553 (1999).

Alexander Johnson's authorization, or lack thereof, to be at Cornerstone lacked any relevance to the issues at trial. The State contends that Johnson's application to reside at Cornerstone established how Melanie Kurtzhall, a key witness for the State, came to be familiar with Johnson. Nevertheless, Kurtzhall could have testified that Johnson applied to become a tenant and she became acquainted with Johnson during the application process, without Kurtzhall adding that the housing authority denied the application. Johnson being denied the application did not allow Kurtzhall to better identify Johnson or add to the evidence of guilt of Johnson.

We consider the admission of Melanie Kurtzhall's testimony of Alexander Johnson as being an unauthorized tenant as harmless error. Inadmissible evidence requires reversal only if the error within reasonable probability, materially affected the outcome. *State v. Everybodytalksabout*, 145 Wn.2d 456, 468-69, 39 P.3d 294 (2002). The error is harmless if the evidence is of minor significance compared to the overall

29

evidence as a whole. *State v. Everybodytalksabout*, 145 Wn.2d at 469.

The State did not emphasize testimony of Alexander Johnson being an unauthorized tenant. Overwhelming evidence, such as Johnson's motive, Johnson's ownership of the pellet gun, the angle of the shots establishing that the shots came from Johnson's apartment, and Johnson's open window, established guilt.

## CONCLUSION

We affirm Alexander Johnson's harassment, second degree assault, malicious harassment, and third degree malicious mischief convictions.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Fearing, J.

WE CONCUR:

Siddoway, J.

Pennell, A.C.J.

30