IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 30294-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CODY JOSEPH KLOEPPER, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

KORSMO, C.J. — Cody Kloepper challenges his convictions for first degree rape, first degree burglary, and first degree assault, primarily arguing that the victim should not have been allowed to identify him at trial. We affirm the convictions and sentence.

FACTS

D.W. awoke in her fourth floor Richland apartment at 4:00 a.m. to prepare for work. An unknown man with long hair attacked her and struck her repeatedly on the head with a metal bar. The two struggled and D.W. defecated in her pants. When asked why he was attacking her, the man responded "because Obama was elected president." The victim told the man that if he was there to rape her, "just do it and get it over with."

He made D.W. get down on her knees, but was unable to penetrate her with his penis. She then heard a package being opened and what she thought was latex gloves. The man then used his fingers to penetrate her vagina and her anus. He covered her with a blanket and told her that if she told anyone, he would "come back and finish it off." A few minutes later D.W. called 911.

D.W. was taken to a Spokane hospital for treatment of her head injuries. An officer there subsequently showed her a six-person photomontage that included a picture of Mr. Kloepper with short hair; D.W. did not identify anyone in the montage. Five days later she was shown a 23-person photomontage that included the same photo of Mr. Kloepper with short hair. D.W. told officers that she recognized Mr. Kloepper[1] with the short hair, but identified Mr. Karl Goering from the montage as the man who attacked her. She also identified Goering from an in-person line-up. He was arrested and charged for the attack on D.W.

The crime scene investigators found what appeared to be the tip of a latex glove covered in D.W.'s blood. A small amount of male deoxyribonucleic acid (DNA) was recovered and subjected to Y-chromosome Short Tandem Repeat (Y-STR) DNA testing. The result excluded Mr. Goering, but matched 1/440 males in the United States population, including Mr. Kloepper. The police advised D.W. on May 5, 2010, that the

---

[1] Kloepper worked for the apartment complex where D.W. lived.

2

DNA "matched" Mr. Kloepper and excluded Mr. Goering. The police also advised that they would continue their investigation and had not ruled Goering out as a suspect.

D.W. returned to the police station on July 28, 2010, and gave a recorded statement that she now believed Mr. Kloepper was the attacker. When asked why she changed her mind, D.W. said, "Well the DNA thing." Mr. Kloepper was charged with the three noted offenses, all of which carried a deadly weapon enhancement. Charges against Mr. Goering were dropped. Mr. Kloepper met the victim's original identification of the assailant far better than Mr. Goering did.

The defense moved to exclude D.W.'s anticipated in-court identification on the basis that her receipt of the DNA information was impermissibly suggestive and had tainted the identification. The trial court denied the motion on the basis that the information went to the weight to be given the testimony rather than its admissibility.

Prior to opening statements, juror 8 indicated by note to the court that his parents were friends of D.W.'s parents while he was growing up. The court did not find a basis for excusal for cause, noting that Juror 8 had not seen D.W. in 40 years and probably would not recognize her.

The jury convicted Mr. Kloepper on all three counts and also found that he was armed with a deadly weapon on each count. The trial court ruled that the rape and assault convictions arose from separate conduct and the sentences would be served consecutively

to each other, while the burglary count would be served concurrently with those counts. Mr. Kloepper then timely appealed to this court.

## ANALYSIS

This appeal raises four claims. Mr. Kloepper contends that the trial court erred in denying his motion to exclude the in-court identification and in failing to remove juror 8. He also argues that his trial attorney provided ineffective assistance and that the court was required to have sentenced him to concurrent terms on all three counts. We will address those issues in the noted order.

*Identification Testimony*

Mr. Kloepper asks us to expand the law concerning impermissibly suggestive identification to include this fact pattern. His argument could effectively prevent a witness from changing an incorrect (or what she perceived as incorrect) prior identification at trial. We conclude that this expansion is inappropriate.

Typically, a trial judge has discretion to admit or exclude evidence at trial. *State v. Kinard*, 109 Wn. App. 428, 432, 36 P.3d 573 (2001). Discretion is abused when it is exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

When impermissibly suggestive government behavior results in the substantial likelihood of the misidentification of a suspect, due process of law requires that trial courts exclude the identification. *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct.

967, 19 L. Ed. 2d 1247 (1968); *State v. Vickers*, 148 Wn.2d 91, 118, 59 P.3d 58 (2002). Typically these types of issues concern pretrial identification procedures that allegedly taint a witness' initial and subsequent identifications. *E.g., Vickers*, 148 Wn.2d at 118; *State v. Cook*, 31 Wn. App. 165, 167-71, 639 P.2d 863 (1982). More recently, arguments have been advanced, unsuccessfully, calling for the exclusion of trial identification testimony on the basis that the witness had failed to identify the defendant during pretrial identification opportunities. *E.g., State v. Sanchez*, 171 Wn. App. 518, 288 P.3d 351 (2012), *review denied*, 177 Wn.2d 1024 (2013) (witness did not identify defendant until after seeing his picture on the news permitted to identify him at trial); *State v. Salinas*, 169 Wn. App. 210, 224, 279 P.3d 917 (2012), *review denied*, 176 Wn.2d 1002 (2013) (witness unable to identify defendant in montage permitted to do so at trial).

The argument that Mr. Kloepper raises is similar to that presented by *Sanchez* and *Salinas*, but with a twist—unlike those cases, there was no suggestion of any action by the government to taint the identification—here Mr. Kloepper contends that the sharing of the DNA results tainted the in-court identification. He finds support for his argument in *State v. McDonald*, 40 Wn. App. 743, 700 P.2d 327 (1985). There the police, after the victim identified one of the suspects in a line-up and said that another might be the man, was told that the two men the victim had mentioned were the ones who had been arrested. *Id.* at 744-45. This court concluded that the information was tantamount to telling the

5

witness that "this is the man." *Id.* at 746. The conviction of the man who had been equivocally identified was reversed. *Id.* at 747-48.

Similarly here, Mr. Kloepper argues with some force that *McDonald* applies and renders D.W.'s in-court identification invalid. When a court finds suggestive government behavior, the court must then determine if there was a substantial likelihood that the resulting identification was erroneous. *Cook*, 31 Wn. App. at 171. If there was no suggestive behavior, then the argument fails and there is no need to consider whether there was a substantial likelihood of misidentification. *Id.*

As to the first factor, it is a close question whether there was suggestive behavior by the government. The communication of the DNA results by a government agent clearly affected the prior identification and, to that extent, can be seen as suggestive behavior. But, critically in our view, the suggestive behavior was not directed to D.W.'s identification of her assailant. Rather, it was made as part of an update of the pending case against Mr. Goering and used to explain to the victim that despite the filing of charges, the investigation was continuing against both men. D.W.'s change in her identification occurred 12 weeks after the communication from the detectives. This case is thus distinguishable from *McDonald* where the suggestive communication was made directly in response to the line-up identification. In light of these circumstances, we are not convinced that this truly was a suggestive identification procedure.

6

However, we need not decide the case solely on that basis as we also doubt that the changed identification resulted in a "substantial likelihood" of a misidentification. If anything, the change prevented a misidentification. The other evidence in the case pointed to Mr. Kloepper, not Mr. Goering, as the assailant. Besides the DNA, Mr. Kloepper better fit D.W.'s initial description of the attacker as a thin, tall (6'2") man with long hair. Mr. Kloepper stood 6'4" and was thin with long hair at the time of the attack.[2] Additionally, against company policy shortly prior to the assault he accessed the supervisor's office in the middle of the night where keys to the apartments, including D.W.'s, could be accessed. D.W. reported that she had locked her door, but the assailant gained entry without force, a fact suggesting that a key was used.

There was not a substantial likelihood of misidentification. Even without D.W.'s identification, the evidence pointed at Mr. Kloepper as the assailant. The defense was thoroughly able to develop D.W.'s earlier identifications of Goering and the reason for her change of mind in order to attack the reliability of her identification testimony. We believe this comported with due process of law. This court recently noted that the United States Supreme Court has declared that the protection "'against a conviction based on evidence of questionable reliability'" is not exclusion of the evidence, but, rather is "'affording the defendant means to persuade the jury that the evidence should be

---

[2] In contrast, Mr. Goering stood only 5'10".

7

discounted as unworthy of credit.'" *Sanchez*, 171 Wn. App. at 572 (quoting *Perry v. New Hampshire*, 565 U.S. ___, 181 L. Ed. 2d 694, 705, 132 S. Ct. 716 (2012)).

As noted, Mr. Kloepper exercised his ability to cross-examine D.W. and argue the reliability of her identification to the jury. In this case he was even able to show why she changed her mind, allowing him to note that the identification testimony was merely derived from the DNA evidence, which was admittedly not very powerful. D.W.'s testimony on this point was effectively impeached.

Under these circumstances, Mr. Kloepper was afforded due process of law. The deficiencies in D.W.'s identification properly went to the weight to be given that information by the jury rather than its admissibility. The trial court did not abuse its discretion in declining the motion to exclude.

*Juror 8*

Mr. Kloepper also argues that the trial court erred in denying his challenge for cause to juror 8 after it came to light he had once been acquainted with D.W. and her family. Again, we conclude there was no abuse of the trial court's discretion.

RCW 2.36.110 requires a judge to dismiss "any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service." "'Actual bias' is 'the existence of a state of mind on the part of the juror in reference . . . to either party, which satisfies the

8

court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging.'" *Hough v. Stockbridge*, 152 Wn. App. 328, 340, 216 P.3d 1077 (2009) (citing RCW 4.44.170(2)). The trial judge has fact finding discretion in determining whether to grant or deny a juror's dismissal based on bias. *State v. Jorden*, 103 Wn. App. 221, 229, 11 P.3d 866 (2000), *review denied*, 143 Wn.2d 1015 (2001). This discretion "allows the judge to weigh the credibility of the prospective juror based on his or her observations." *Id.* Appellate courts defer to the trial judge's decision. *Id.*

After being selected, juror 8 indicated in a note that he had learned that his parents were friends of D.W.'s parents. Juror 8 knew the parents of D.W. and would occasionally see them at the golf course. In response to questioning, juror 8 indicated that he did not have any social activities with D.W., would not know her by sight, and that it had been at least 40 years since he had seen her. He also responded that he felt he could be a fair and impartial juror, and that he could listen with a blank slate.

After hearing argument, the court decided that there was not a sufficient basis to excuse juror 8 for cause:

> He indicated that he was just an acquaintance, that he last saw the victim 40-some years ago. That he probably would not recognize her on site. He's had no contact with her. He is older than her. That the only reason why this even jogged any sort of memory was because he advised his mother that he was on jury duty. From the Court's perspective, there has not been a sufficient showing that this juror needs to be excused for cause.

Report of Proceedings at 63.

These were tenable grounds for denying the challenge for cause. The juror had only a passing acquaintance with D.W. 40 years earlier and indicated that nothing about that fact would affect his ability to serve in this case. The trial court was permitted to credit that information. Nothing in the record of this case suggests that juror 8 was biased in favor of D.W. or against Mr. Kloepper. An acquaintance with D.W.'s family 40 years earlier did not amount to bias as a matter of law.

The trial court did not abuse its discretion in denying the challenge to juror 8.

*Ineffective Assistance of Counsel*

Mr. Kloepper also argues that his counsel provided ineffective assistance by failing to challenge a detective's statement that Mr. Kloepper's information was in a system used to record contacts with police. Counsel did not err in declining to challenge this passing information.

Well-settled standards govern our review of this argument. The Sixth Amendment guaranty of counsel requires that an attorney perform to the standards of the profession. Counsel's failure to live up to those standards will require a new trial when the client has been prejudiced by counsel's failure. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). In evaluating ineffectiveness claims, courts must be highly deferential to counsel's decisions. A strategic or tactical decision is not a basis for finding error. *Strickland v. Washington*, 466 U.S. 668, 689-91, 104 S. Ct. 2052, 80 L. Ed. 2d 674

(1984). Under *Strickland*, courts apply a two-prong test: whether or not (1) counsel's performance failed to meet a standard of reasonableness and (2) actual prejudice resulted from counsel's failures. *Id.* at 690-92. When a claim can be disposed of on one ground, a reviewing court need not consider both *Strickland* prongs. *State v. Foster*, 140 Wn. App. 266, 273, 166 P.3d 726, *review denied*, 162 Wn.2d 1007 (2007).

While defense counsel was cross-examining the lead detective on how the photomontages were constructed, the detective testified that the I-Leads system supplied many of the photos. I-Leads was described as a local system that included booking photos and other police contact information. The detective testified that while most of the montage photos came from I-Leads, the police had used Mr. Kloepper's employment photo. When asked by defense counsel if police had not also had a Department of Licensing (DOL) photo of Mr. Kloepper, the detective responded that police also had an I-Leads photo of Mr. Kloepper, but he was not sure if there was a DOL photo.

Defense counsel did not object to this testimony. Mr. Kloepper now argues that his counsel provided ineffective assistance by failing to object, contending that the information conveyed the fact that he had a criminal history. We do not believe the decision to not challenge the answer established defective performance by counsel.

The decision to object, or to refrain from objecting even if testimony is not admissible, is a tactical decision not to highlight the evidence to the jury. It is not a basis for finding counsel ineffective. *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662,

11

*review denied*, 113 Wn.2d 1002 (1989).[3] Similarly, our case law recognizes that the decision to decline a limiting instruction for ER 404(b) evidence likewise is a tactical decision not to highlight damaging evidence. *E.g., State v. Yarbrough*, 151 Wn. App. 66, 210 P.3d 1029 (2009) (failure to propose a limiting instruction presumed to be a legitimate trial tactic not to reemphasize damaging evidence); *State v. Price*, 126 Wn. App. 617, 649, 109 P.3d 27 (2005) ("We can presume that counsel did not request a limiting instruction" for ER 404(b) evidence to avoid reemphasizing damaging evidence); *State v. Barragan*, 102 Wn. App. 754, 762, 9 P.3d 942 (2000) (failure to propose a limiting instruction for the proper use of ER 404(b) evidence of prior fights in prison dorms was a tactical decision not to reemphasize damaging evidence).

The decision to not object to or seek a cure for damaging evidence is a classic tactical decision. Counsel did not provide ineffective assistance by ignoring the I-Leads comment.

*Consecutive Sentences*

Mr. Kloepper also argues that the trial court erred in deciding that the assault and rape convictions did constitute "separate and distinct conduct." Although the trial court

---

[3] "The decision of when or whether to object is a classic example of trial tactics. Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal." *Madison*, 53 Wn. App. at 763.

could have decided the matter differently, there was no abuse of discretion in the court's ruling.

Mr. Kloepper's convictions for first degree assault and first degree rape are classified as serious violent offenses. RCW 9.94A.030(45). RCW 9.94A.589(1)(b) provides that in sentencing serious violent offenses, the crimes will be sentenced consecutively to each other[4] if they arise from "separate and distinct criminal conduct." That standard is defined to be the same as the "same criminal conduct" standard of RCW 9.94A.589(1)(a). *State v. Brown*, 100 Wn. App. 104, 112-15, 995 P.2d 1278 (2000), *aff'd in part and rev'd in part*, 147 Wn.2d 330, 58 P.3d 889 (2002) (reviewing legislative history). Crimes that do not constitute the same criminal conduct are necessarily separate and distinct offenses. *Id.* at 115.

"Same criminal conduct" means that the offenses occurred at the same time and same place, had the same victim, and have the same criminal intent. RCW 9.94A.589(1)(a). Offenses have the same criminal intent when, viewed objectively, the intent does not change from one offense to the next. *State v. Dunaway*, 109 Wn.2d 207, 215, 743 P.2d 1237 (1987). "Intent, in this context is not the particular *mens rea* element of the particular crime, but rather is the offender's objective criminal purpose in

---

[4] To mitigate the effects of the consecutive sentences, the other current serious violent offenses are not used in the offender score calculation and the offense(s) having the shorter sentence ranges are scored with an offender score of zero regardless of the offender's criminal history. RCW 9.94A.589(1)(b).

committing the crime." *State v. Adame*, 56 Wn. App. 803, 811, 785 P.2d 1144 (1990).

Courts have also looked at whether one crime furthers the other or whether the offenses

were part of a recognized plan or scheme. *Dunaway*, 109 Wn.2d at 215 (furtherance

test); *State v. Lewis*, 115 Wn.2d 294, 302, 797 P.2d 1141 (1990) (same scheme or plan).

The trial court's same criminal conduct ruling is reviewed for abuse of discretion

because it involves a factual inquiry. *State v. Graciano*, 176 Wn.2d 531, 536, 295 P.3d

219 (2013). Thus, "when the record supports only one conclusion on whether crimes

constitute the 'same criminal conduct,' a sentencing court abuses its discretion in arriving

at a contrary result. But where the record adequately supports either conclusion, the

matter lies in the court's discretion." *Id.* at 537-38 (citation omitted). This exception "is

generally construed narrowly to disallow most claims that multiple offenses constitute the

same criminal act." *State v. Porter*, 133 Wn.2d 177, 181, 942 P.2d 974 (1997).

The parties agree that the time, place, and victim elements of the same criminal

conduct test were met in this case. They disagree whether the two offenses shared the

same criminal intent.[5] Noting that the assault ended when the victim "submitted" to the

rape, Mr. Kloepper argues that the assault furthered that crime and, hence, was not a

---

[5] The trial court also treated the first degree burglary conviction as a separate offense for scoring purposes. Whether it did so on the basis of the same criminal conduct analysis of RCW 9.94A.589(1)(a) or by operation of the anti-merger statute, RCW 9A.52.050 is unclear.

separate and distinct offense. In this view, the assault overcame the anticipated resistance to the rape and was part and parcel of that offense.

The trial court could have viewed the evidence that way. It did not, however, and this court is not in a position to overturn that decision because this incident did not have to be viewed in that manner. For one thing, the assailant never expressed any intent to engage in sexual intercourse until the victim broached the subject. Repeatedly striking a person on the head with a metal bar evinces an intent to cause serious physical injury rather than to facilitate sexual intercourse. More commonly, the threat to use force is at least initially made in order to obtain a victim's cooperation; that did not happen here. Additionally, severe injury also can effectively hinder sexual intercourse as occurred here when the victim defecated. We believe that the trial court was free to view the rape as a crime of opportunity that presented itself after the assault rather than as the object of the attack.

Because we cannot say that the assault and the rape shared the same objective criminal intent, the trial court cannot have abused its discretion in treating the two crimes as separate and distinct offenses.

No. 30294-6-III
*State v. Kloepper*

Affirmed.

_____
Korsmo, C.J.

I CONCUR:

_____
Fearing, J.

16

No. 30294-6-III

BROWN, J. (concurring in part, and dissenting in part) — I agree with and concur in Cody J. Kloepper's convictions and the resolution of the identification, ineffective assistance, and juror selection issues. I disagree solely with the trial court's consecutive sentencing for first degree assault and first degree rape. In my view, the facts show "same criminal conduct" within the meaning of RCW 9.94A.589(1)(a), not "separate and distinct criminal conduct" under RCW 9.94A.589(1)(b). Our sole focus is "same criminal intent" because the parties agree the facts show the same victim, time, and place. Three parts of the record show Mr. Kloepper's criminal intent from beginning to end was assaulting D.W. to accomplish her rape.

First, at the beginning, soon after his frustrated sexual encounter with a third person in his search for random sex, Mr. Kloepper entered D.W.'s apartment shirtless at 4:00 a.m. on a freezing winter's day and began brutally assaulting her. D.W. described Mr. Kloepper's Obama remark as a "sarcastic" answer to her question why all this was happening. Report of Proceedings (RP) at 137. Mr. Kloepper's criminal intent to rape then became plain to D.W. and objectively explains her submissive response "just do it

[the rape] and get it [the rape] over with." RP at 129-30. D.W.'s explanation regarding Mr. Kloepper's criminal intent is undisputed; D.W. submitted to his rape to end the assault. Thus, according to D.W., the assault furthered the rape. Therefore, any other explanation is unpermitted conjecture.

Second, Mr. Kloepper communicated his true response to D.W.'s question and her submission with nonverbal conduct by immediately abating his assault and making her kneel so he could penetrate her. Mr. Kloepper used latex gloves he brought with him for that exact purpose, further revealing his intent throughout to rape D.W.

Third, at the end of D.W.'s ordeal, Mr. Kloepper threatened if she reported him, he would "come back and finish it off [singularly referring to the brutal rape]." RP at 131. Mr. Kloepper's threat unequivocally establishes the "same criminal intent" throughout D.W.'s assault and rape.

In sum, I would reverse the trial court's consecutively sentencing of Mr. Kloepper for first degree rape and first degree assault because the facts solely support a "same criminal conduct" finding under RCW 9.94A.589(1)(a). Accordingly, I respectfully dissent.


Brown, J.