IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | ) |
| Respondent, | ) No. 77031-4-I |
| | ) |
| | ) DIVISION ONE |
| v. | ) |
| | ) |
| DAVID EDWARD DREWERY III, | ) UNPUBLISHED OPINION |
| | ) |
| Appellant. | ) FILED: April 1, 2019 |

SMITH, J. — David Edward Drewery III appeals his conviction for drive-by shooting. He argues that his counsel was ineffective for failing to object when the State solicited testimony from Drewery's girlfriend that Drewery "should have known something like this could have happened," in direct violation of the trial court's in limine ruling just 20 minutes earlier. This improperly solicited testimony was central to the State's case, and an objection would likely have been sustained. Furthermore, no legitimate tactic or strategy can explain counsel's failure to object, and Drewery was prejudiced by that failure. Therefore, we reverse.

FACTS

Drewery was the driver of a car from which shots were fired during a drive-by shooting on March 15, 2017. At the time of the shooting, there were three passengers in Drewery's car. One of them was Malik Fulson, to whom Drewery's girlfriend, Rayzene McCartha, had recently introduced Drewery.

The State charged Drewery with drive-by shooting under an accomplice liability theory. During trial, the jury heard testimony that on the day of the shooting, Drewery borrowed McCartha's car, a black Nissan, and picked up Fulson from his work at Popeye's restaurant. Drewery testified that when he picked up Fulson, Fulson indicated that some of his friends were at Kush Mart, a cannabis retailer, and asked Drewery to drive there. Drewery complied, drove to Kush Mart, and parked on the road outside the Kush Mart parking lot in front of a white car that was already there. A number of people were gathered by the white car. Drewery testified that everyone "kind of mingled together, chitchat[ting]." He testified that he did not know any of the other people in the group.

At some point, Karar Al-Buturky drove into the Kush Mart parking lot in his BMW. His friends, Mohammed Al-Rikabi and Ali Al-Nighashi, were with him in the car. As they pulled into Kush Mart, they saw a group of people hanging out by two cars—a white Nissan and a black Nissan. Al-Buturky and his friends exchanged looks with the group. When they were finished at Kush Mart, they got back into Al-Buturky's car. As they left the Kush Mart parking lot, they again passed the group of people hanging out by the white and black cars. Because some of the group were in the roadway, Al-Buturky had to drive around them and into the opposite lane of traffic. Al-Nighashi testified that as Al-Buturky did so, one person in the group "did something with his back where he got closer to the car. . . . He was looking at us like this as we passed him, and he kind of moved his body closer to the car as we continued going." Al-Buturky gave his car a "good amount" of gas as he went around.

2

Drewery testified that he did not see Al-Buturky's BMW arrive at Kush Mart, but he did notice it leave. He testified that, at some point before the BMW left, Fulson asked him to give two of Fulson's friends a ride and drop Fulson off with them. Drewery agreed and began moving a car seat and other items into the trunk of his car. He noticed the BMW leave as he was closing his trunk. As Drewery, Fulson, and Fulson's friends left in Drewery's car, Fulson asked Drewery to follow the white car that had been parked with him. Drewery complied.

According to Al-Buturky, after leaving Kush Mart, he planned to drive to Al-Rikabi's house a short distance away. But on the way there, he noticed the white car pull up quickly behind him as if it were following him, then make a U-turn and go back the other direction. Instead of turning into Al-Rikabi's house, Al-Buturky decided to keep driving. Al-Buturky testified that the black car then appeared and followed him. Al-Buturky eventually stopped at a stop sign at Olympic and Madison, deciding whether to go left or right. He testified that the black car pulled up and stopped about two car lengths behind him, and at that point, he saw the driver and the front passenger making what he perceived as gang signs. He testified that the black car then pulled up next to him on the left side of his car and stopped. A gun appeared out of the black car's passenger-side rear window and began shooting at Al-Buturky's car.

According to Drewery, after he departed the Kush Mart with Fulson and his friends, he was trying to figure out where the white car went when he noticed it driving back toward him. He stopped his car and asked Fulson if he should

3

turn around and follow the white car, but Fulson, who was sitting in the seat behind him, told him to keep going. Drewery continued driving and eventually came upon the BMW, sitting at a stop sign. Drewery testified that the BMW was "just sitting there," not moving, and that he was trying to figure out whether it was going to keep going. He testified that he did not make any obscene gestures at the BMW. But he could see the BMW driver's face in the BMW's rearview mirror and may have tried to communicate something to the effect of, "So are you going to move your car? Are you just kind of sitting there? What's [sic] you going to do? Are you going to move your car?" When the BMW did not move, Drewery decided to drive around it to the left. As he did so, he heard gunshots. He testified that he did not know where they were coming from.

Al-Buturky testified that as soon as he and his passengers heard gunshots, they ducked down in the car. After the firing stopped and Al-Buturky and his passengers confirmed that none of them had been shot, they decided to chase down the black car, hoping to get a license plate number. A high-speed chase ensued as Al-Buturky pursued the black car. At one point, he witnessed the black car blow a tire as it hit a curb going around a corner. Al-Buturky also saw the black car stop in a residential area and the passengers exit the car and run away. Eventually, the black car pulled into Popeye's restaurant and parked. Al-Buturky followed and stopped in front of Popeye's. He saw Drewery get out of the black car, saying something like, "[I]t wasn't me, I didn't mean to, I didn't do it." Al-Buturky and Al-Nighashi approached Drewery and pinned him to the ground. Officers responded shortly thereafter.

4

According to Drewery, once he heard the gunshots at Olympic and Madison, he "put [his] feet on the accelerator" and thought, "I'm going. I'm not staying here." After driving a short distance, he looked back to see if everyone was all right in the car. At that point, he saw a gun in his rear passenger-side passenger's lap. Drewery testified that he went from being scared to being "pissed off" and that as he was driving, he made the decision that he needed to get everyone out of his car. After hitting a curb, he stopped and told his passengers that he wasn't driving anymore and that "You guys need to get the hell out of my car." Drewery testified that Fulson initially protested, but Drewery yelled at them to get out of the car and they did. He testified that he then drove back to Popeye's to get more information about Fulson and to call the police.

McCartha also testified at trial. Before she did so, the State requested to elicit testimony from McCartha that when she learned about the drive-by shooting from the police, "she was mad that her car and her boyfriend got caught up in this and basically made the comment that night that she was mad because the defendant didn't have to follow this car *and he should have known that something like this could have happened.*" (Emphasis added.) Defense counsel objected on the basis that the testimony constituted McCartha's opinion. The court then ruled:

> I think that she can say that she's angry, that it was her car, he should not have done this sort of thing. *The final line I don't think she can say. That's an opinion.* But her anger at the fact that he placed himself in a dangerous situation, with dangerous people, I think that's legitimate.[1]

---

[1] (Emphasis added.)

Nevertheless, just 20 minutes after the court's ruling, the following exchange occurred during the State's examination of McCartha:

Q.  [PROSECUTOR]: Ms. McCartha, did there come a time on the evening of March 15, 2017, when you got a call from your boyfriend Dave Drewery?
A.  Yes.
Q.  And is it fair to say that he was with some detectives when that call happened?
A.  Yes.
Q.  All right. Now, the detectives didn't tell you anything about exactly what had happened that night, did they?
A.  No, they were very blunt about what happened.
Q.  They were what?
A.  Blunt. They just told me the car had been involved in a drive-by and that was basically it.
Q.  You had sort of an emotional reaction to that, didn't you?
A.  Yes.
Q.  Would it be fair to say that you were angry?
A.  Yes.
Q.  And would it also be fair to say that you were angry because you had previously warned Dave about hanging out with Malik because he is dangerous?
A.  Yes.
Q.  *And that he should have known something like this could have happened?*
A.  *Yes.*[2]

Defense counsel did not object to this testimony. A jury later convicted Drewery as charged. Drewery appeals.

## ANALYSIS

Drewery argues that his counsel was ineffective for failing to object when the prosecutor, in direct contravention of the trial court's in limine ruling, asked McCartha whether Drewery "should have known something like this could have

---

[2] (Emphasis added.) According to the verbatim report of proceedings, the court made its ruling at 9:36 a.m., and the prosecutor elicited McCartha's "should have known" testimony at 9:56 a.m.

happened." We agree.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution guarantee the right to effective assistance of counsel. In re Pers. Restraint of Brett, 142 Wn.2d 868, 873, 16 P.3d 601 (2001). "A claim of ineffective assistance of counsel is an issue of constitutional magnitude that may be considered for the first time on appeal." State v. Salas, 1 Wn. App. 2d 931, 949, 408 P.3d 383, review denied, 190 Wn.2d 1016 (2018). To prevail on a claim of ineffective assistance, a defendant must establish that (1) his attorney's performance was deficient and (2) the deficiency prejudiced him. State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). Here, Drewery has established both deficient performance and prejudice.

1. Counsel's performance was deficient

To establish that counsel's performance was deficient, Drewery must prove that "counsel's performance fell below an objective standard of reasonableness in light of all the circumstances." In re Pers. Restraint of Lui, 188 Wn.2d 525, 538, 397 P.3d 90 (2017). "The threshold for the deficient performance prong is high, given the deference afforded to decisions of defense counsel in the course of representation." State v. Grier, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). "To prevail on an ineffective assistance claim, [the] defendant . . . must overcome 'a strong presumption that counsel's performance was reasonable.'" Grier, 171 Wn.2d at 33 (quoting Kyllo, 166 Wn.2d at 862). To that end, counsel's performance is not deficient if counsel's conduct can be characterized as legitimate trial strategy or tactics. Grier, 171 Wn.2d at 33.

7

Additionally, "to establish deficient performance based upon defense counsel's failure to object, the defendant must show . . . that the proposed objection would likely have been sustained." State v. Townsend, 142 Wn.2d 838, 850, 15 P.3d 145 (2001). "Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal." State v. Madison, 53 Wn. App. 754, 763, 770 P.2d 662 (1989).

Here, it is beyond dispute that McCartha's testimony was central to the State's case. The State acknowledged as much when it explained to the court, before McCartha testified, why it was considering calling McCartha in its case in chief, rather than solely as a rebuttal witness. Specifically, the prosecutor stated: "So from my perspective *this is very important because it goes to the element that will be the only contested issue here*, which is the defendant's knowledge of what was going to happen before it happened." (Emphasis added.)

Additionally, the State initially hoped to elicit from McCartha not only that she had warned Drewery about Fulson and that in her opinion Drewery should have known something like this could happen, but also that Fulson was "pretty deep . . . into the gang life-style" and that he was a Crip. The State explained that McCartha's testimony on these matters "directly goes to [Drewery's] knowledge of the type of violent behavior that was about to follow when he was . . . obeying Mr. Fulson's instructions to follow this car." The court barred testimony regarding Fulson's gang affiliation along with McCartha's opinion that Drewery "should have known that something like this could have happened."

8

The fact that the prosecutor decided to risk an objection—or even a motion for a mistrial—by posing the very question prohibited by the court further demonstrates that the State considered McCartha's "should have known" testimony central to its case.

In light of these circumstances, defense counsel's failure to object was egregious and cannot be explained by any legitimate tactic or strategy. Having participated in the above-described argument regarding the permitted scope of McCartha's testimony, defense counsel was clearly aware of its import to the State. Furthermore, because the trial court had ruled, just 20 minutes earlier, that McCartha's "should have known" testimony was inadmissible, an objection to that very testimony would likely have been sustained. Finally, the prosecutor's single question, and McCartha's response to it, could readily have been addressed with a curative instruction had counsel objected. For these reasons, counsel's performance was deficient.

The State contends that counsel's performance can be explained by legitimate trial tactics. It first argues, relying on State v. Kloepper, 179 Wn. App. 343, 317 P.3d 1088 (2014), that counsel "could have reasonably decided that an objection would have highlighted the testimony." The State's reliance on Kloepper is misplaced. In Kloepper, a detective testified about the process used to create a photomontage in which the defendant's photo had appeared. Kloepper, 179 Wn. App. at 355. The detective explained that although most montage photos come from I-Leads, a database that includes booking photos and other police contact information, the police had used the defendant's

employment photo. Kloepper, 179 Wn. App. at 355. When defense counsel asked whether the police also had a Department of Licensing (DOL) photo of the defendant, the detective responded that the police had an I-Leads photo of the defendant, but that he was unsure about a DOL photo. Kloepper, 179 Wn. App. at 355.

On appeal, the defendant argued that defense counsel was ineffective for failing to object to this testimony, which he argued conveyed that he had a criminal history. Kloepper, 179 Wn. App. at 355. Division Three disagreed, characterizing the detective's reference to an I-Leads photo as "passing information" and counsel's decision not to object as a tactical decision not to highlight the evidence to the jury. Kloepper, 179 Wn. App. at 354, 355.

Here, McCartha's testimony was not just "passing information." As discussed, her testimony and her opinions were, according to the State's own arguments, directly relevant to Drewery's knowledge—the central issue in this case. Kloepper does state that "[t]he decision to object, or to refrain from objecting . . . is not a basis for finding counsel ineffective." Kloepper, 179 Wn. App. at 355. But the case Kloepper cites for that proposition acknowledges that the failure to object may, "in egregious circumstances, on testimony central to the State's case, . . . constitute incompetence of counsel justifying reversal." Madison, 53 Wn. App. at 763. As discussed, counsel's failure to object here was egregious, and McCartha's testimony was central to the State's case. Therefore, Kloepper is not persuasive.

The State next argues that counsel "could have also reasonably

10

concluded that an objection may result in confusing jurors." Specifically, it argues that an objection could have invited additional argument, and what constitutes an improper opinion "is not always clear cut." This argument is not persuasive. First, the trial court ruled on the exact testimony at issue just 20 minutes earlier, following argument from counsel. There is no reason to suspect that the court would have entertained further argument, particularly where the excluded testimony was not accidentally volunteered by McCartha, but instead was deliberately repeated by the prosecutor himself in a leading question during McCartha's direct examination, in outright violation of the court's ruling. Second, even if the court were inclined to entertain further argument, that argument could easily have taken place outside the presence of the jury.

Furthermore, in accomplice liability cases, the State is required to prove that the defendant acted with *actual* knowledge that he was promoting or facilitating the crime charged. State v. Allen, 182 Wn.2d 364, 374, 341 P.3d 268 (2015). To this end, our Supreme Court has observed that the knowledge standard can be "understandably misinterpret[ed] . . . to allow a finding of knowledge . . . if the defendant 'should have known.'" Allen, 182 Wn.2d at 374 (quoting State v. Shipp, 93 Wn.2d 510, 514, 610 P.2d 1322 (1980)). In an attempt to clarify the knowledge standard, defense counsel had, just two days before McCartha testified, proposed adding the following sentence to the pattern instruction: "In order to find that the defendant was an accomplice in this matter, you must find that he had *actual knowledge* that he was promoting or facilitating the commission of the crime." (Emphasis added.) In other words, defense

11

counsel clearly understood that the knowledge standard was subject to misinterpretation, and that admission of McCartha's "should have known" testimony would make juror confusion more—not less—likely. This was later confirmed when counsel argued, before the court ultimately rejected counsel's proposed instruction, that "[i]f it's absent . . . , the jury can read this instruction and go with the 'should have known' inference, which is inappropriate in an accomplice liability case." In short, it is clear from the record that avoiding juror confusion was not counsel's tactic for failing to object to McCartha's testimony, nor would it have been a *legitimate* tactic under the circumstances.

Finally, the State argues that counsel "could have also made a strategic decision to refrain from objecting also because in the end the testimony did not do much to damage the defense." But this argument is completely disingenuous because the State itself both (1) argued to introduce McCartha's testimony as going to the "critical element" of Drewery's knowledge and (2) reemphasized McCartha's testimony during closing. Furthermore, the State's argument is belied by the fact that when the State indicated it planned to highlight McCartha's testimony in closing, defense counsel strenuously objected, characterizing McCartha's testimony as "improper." That objection would not have been necessary if, as the State contends, counsel thought McCartha's testimony did not do much to damage the defense. The State's argument is unpersuasive.

Counsel's failure to object to the prosecutor's solicitation of McCartha's "should have known" testimony cannot, under the circumstances, be explained by any legitimate strategy or tactic. Therefore, Drewery has met his burden to

12

establish deficient performance.

*2. Counsel's deficient performance prejudiced Drewery*

To establish that he was prejudiced by counsel's deficient performance, Drewery must prove "that in the absence of counsel's deficiencies, there is a reasonable probability that the result of the proceeding would have been different." Lui, 188 Wn.2d at 538. "'Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" Lui, 188 Wn.2d at 538-39 (internal quotation marks omitted) (quoting Harrington v. Richter, 562 U.S. 86, 104, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)). "In other words, '[t]he likelihood of a different result must be substantial, not just conceivable.'" Lui, 188 Wn.2d at 539 (alteration in original) (quoting Harrington, 562 U.S. at 112).

Here, a substantial likelihood exists that, had defense counsel objected, the outcome of Drewery's trial would have been different. Had counsel objected, the objection would likely have been sustained, and McCartha's improperly elicited testimony would have been stricken from the record. And had McCartha's testimony been stricken from the record, the State would have been precluded from mentioning—much less emphasizing—that testimony in closing. But instead, the jury heard—not just once, but twice—that in McCartha's opinion, Drewery "should have known" that something like the drive-by shooting could have happened: first, as McCartha's final statement in her direct testimony, and second, in the State's closing, when the prosecutor argued:

> You know a lot about the knowledge that the Defendant had
> about what he was getting himself into. You heard from his

13

girlfriend . . . already about how dangerous Malik was and that he had been told about that, warned about that, and that in [McCartha]'s opinion he should have known something like this could have happened.

The jury's ability to consider McCartha's opinion prejudiced Drewery. In accomplice liability cases such as this one, where there is no direct evidence of the defendant's knowledge, "the trial turn[s] on whether the State produced sufficient circumstantial evidence to allow the jury to infer . . . actual knowledge." Allen, 182 Wn.2d at 375. To that end, the trial court, after "struggling" with whether to accept Drewery's proposed clarification to the knowledge instruction, ultimately rejected it and gave the pattern instruction on knowledge, which is based on Washington's culpability statute. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 10.02, at 222 (4th ed. 2016) (citing RCW 9A.08.010). Under that statute, the jury is not allowed to find knowledge based on a finding that the defendant "'should have known,'" but is allowed to *infer* knowledge if the defendant had information that would lead a reasonable person in the defendant's situation to believe that the fact at issue exists. Allen, 182 Wn.2d at 374; see also RCW 9A.08.010(1)(b)(ii).

This distinction, as our Supreme Court has recognized, is subtle—but critical. Allen, 182 Wn.2d at 374. And as discussed, even our Supreme Court has recognized that jurors "could understandably misinterpret Washington's culpability statute to allow a finding of knowledge 'if an ordinary person in the defendant's situation would have known' the fact in question, or in other words, if the defendant 'should have known.'" Allen, 182 Wn.2d at 374 (quoting Shipp, 93 Wn.2d at 514). For this reason, McCartha's opinion that Drewery "should have

14

known" prejudiced Drewery. The admission of McCartha's testimony allowed the State to argue during closing that McCartha's opinion about what Drewery should have known was relevant to the ultimate issue of "the knowledge that [Drewery] had about what he was getting himself into." But this argument improperly suggested to the jury that it could find knowledge if an ordinary person in Drewery's situation (i.e., being with Fulson, a dangerous person McCartha had warned Drewery about) should have known that something like this (i.e., a drive-by shooting) could happen. Given the critical distinction between what Drewery "should have known" and what he *did* know, the prosecutor's improper solicitation of McCartha's testimony and defense counsel's failure to object to it prejudiced Drewery.

The State contends that Drewery was not prejudiced because "there was substantial circumstantial evidence demonstrating the defendant's knowledge of the crime." The State then describes other circumstantial evidence that it asserts demonstrates Drewery and his passengers intended to intimidate the occupants of Al-Buturky's car and that after the shooting, Drewery was driving like he "was trying to escape." It argues that "[t]his evidence was similar to the circumstantial evidence this Court found sufficient to convict as an accomplice to drive by shooting in Sarausad v. State," 109 Wn. App. 824, 39 P.3d 308 (2001). But in Sarausad, there was testimony from passengers in the defendant's vehicle that "'capping' (shooting) was mentioned during the trip [to the scene of the shooting,]" and that upon approaching, the defendant said, "'Are you ready?'" Sarausad, 109 Wn. App. at 831. Furthermore, it was established in Sarausad

15

that the defendant and the passengers in his car were fellow gang members and that the targets of the shooting were members of a rival gang. Sarausad, 109 Wn. App. at 831.

Here, by contrast, the evidence of Drewery's actual knowledge and his relationship with his passengers is far more lacking. The only testimony about what happened in Drewery's car in the moments leading up to the shooting was that Drewery and his front seat passenger may have made some gestures at Al-Buturky, which Al-Buturky and his passengers perceived as gang signs based primarily on movies and music videos. Even if Drewery did intend to intimidate Al-Buturky and his passengers, the instances of alleged intimidation here are weak evidence of any actual knowledge on Drewery's part that a drive-by shooting was forthcoming. To this end, Drewery explained that the reason he may have gestured to Al-Buturky while stopped behind him at the stop sign was that Al-Buturky's car was just sitting there, not moving. Furthermore, Drewery testified that he drove erratically after the shooting because he was focused on trying to get Fulson and his friends out of the car. He also testified that he did not know his passengers, other than Fulson, and that testimony was not contradicted.

Moreover, Sarausad involved a sufficiency-of-the-evidence challenge. Sarausad, 109 Wn. App. at 844. In that context, the court considers "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Dreewes, ___ Wn.2d ___, 432 P.3d 795, 800

16

(2019) (internal quotation marks omitted) (quoting State v. Johnson, 188 Wn.2d 742, 762, 399 P.3d 507 (2017)). Here, on the other hand, the court's inquiry is not whether there was sufficient evidence to justify upholding the verdict, but whether, absent counsel's deficient performance, there is a *reasonable probability* that the outcome would have been different—"a 'probability sufficient to undermine confidence in the outcome.'" State v. Drath, ___ Wn. App. 2d ___, 431 P.3d 1098, 1104 (2018) (quoting State v. Estes, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017)); cf. Allen, 182 Wn.2d at 375-76 (explaining in a prosecutorial misconduct case that prejudice is not a matter of whether there is sufficient evidence to justify upholding the verdict but rather whether there is a substantial likelihood that the instances of misconduct affected the jury's verdict). Here, our confidence in the outcome is undermined because McCartha's improperly solicited opinion went directly to a critical factual determination that our Supreme Court has recognized "a juror could understandably misinterpret." Allen, 182 Wn.2d at 374. Additionally, during deliberations, the jury submitted an inquiry to the court indicating that it was struggling with what evidence it could consider in determining Drewery's guilt.[3] Drewery has established prejudice, and the State's reliance on Sarausad and other circumstantial evidence in this case is misplaced.

---

[3] The jury asked, "Is our judgement [sic] based on solely prior knowledge to the crime being committed, or does it include actions there after[?]"

No. 77031-4-I/18

We reverse.

WE CONCUR:

Andrus, J.

Smith, J.

Appelwick, C.J.

18