IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  36574-3-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES M. KOOGLER, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — James Koogler appeals his conviction for the second degree assault of his wife.  He admitted at trial that he was intoxicated and angry at the time of the alleged assault and even told his wife he would kill her if she ever again abandoned him in cold snowy weather.  But he argues that the State presented insufficient evidence that he intended to cause her to fear bodily injury.  He also contends he received ineffective assistance of counsel when his lawyer failed to have him clarify an incriminating answer given in cross-examination.

The evidence was sufficient and Mr. Koogler fails to demonstrate that his lawyer's representation was deficient.  For those reasons, and because Mr. Koogler raises no meritorious issues in a statement of additional grounds, we affirm.

FACTS AND PROCEDURAL BACKGROUND

In December 2017, James Koogler had been married to Karolyn Koogler for eight years. She had adult children and grandchildren from earlier marriages. During the last week of December, Karolyn's son Colin Mathiesen and his wife and two children had traveled from Western Washington to stay at the Kooglers' home in Spokane. Karolyn's mother was flying in from Olympia on the afternoon of December 29. Plans were made for the Kooglers, Colin's family, the family of Karolyn's daughter Sarah, and Karolyn's mother to spend time that evening at a roller skating rink, followed by pizza.

At around 1:00 in the afternoon of the 29th, Mr. Koogler and Karolyn left home with plans to go grocery shopping before driving to the airport to pick up Karolyn's mother. Mr. Koogler wanted to have a drink first, so they stopped at a bar—Birdy's Sports Bar—where Karolyn suggested they had time for one beer. Mr. Koogler did not stop at one beer, and Karolyn eventually told him she needed to leave for the grocery store and would pick him up later. It turned out she had lost too much time to finish the grocery shopping and get to the airport, so she called Colin, who agreed to pick up his grandmother. Colin also agreed to pick up Mr. Koogler. Through text and voice mail messages, Karolyn and Colin notified Mr. Koogler of the changing plans, but Mr. Koogler did not hear his phone or check for messages.

Colin traveled to Birdy's at around 6:00 p.m., but Mr. Koogler was not there. After talking to the bartenders about where Mr. Koogler might have gone, Colin looked

2

for him at a couple of other local bars without success. He telephoned still other bars, again without success. The family roller skating and pizza went forward as planned, but Mr. Koogler never arrived.

When it was time to go home, it was decided that Colin's wife and children would stay with Sarah's family that night and Colin would return to the Koogler home with his mother. Colin would later testify that this was "because I didn't want my children to be there when Mr. Koogler returned intoxicated because of past situations." Report of Proceedings (Oct. 29, 2018) (RP) at 53.

Colin and Karolyn arrived at the Koogler home at around 9:00 p.m. Mr. Koogler was not there. They talked for a few moments and then Ms. Koogler went to bed. It had been snowing, so Colin went out to shovel the driveway. He continued shoveling the driveway until Mr. Koogler arrived, having been given a ride home by an employee of a bar. While Mr. Koogler sat in the truck and talked to the employee for about 15 minutes, Colin went back into the house.

Mr. Koogler would later testify that he had continued drinking beer at Birdy's until it started to get dark, at which point, he was given a ride part way to the family's pizza destination and began walking, but could not find it. He continued walking until around 7:00 p.m., when he stopped at another bar. He later described himself as "feeling left behind and abandoned." RP (Oct. 26, 2018) at 258. He ended up at a third bar,

3

where he drank a couple of pints of beer until an employee who was getting off work offered him a ride home.

Unbeknownst to Colin, Mr. Koogler had learned a day or two earlier that Karolyn had incurred almost $30,000 in credit card debt without Mr. Koogler's knowledge. A substantial part of the borrowing had been to help Karolyn's son Mark with a car purchase and education expenses. Karolyn was aware that Mr. Koogler had learned about the debt, and viewed him as initially kind and understanding about it.

But when Mr. Koogler entered his house on the night of December 29, he was angry, and Karolyn assumed it was about the debt. When he entered the home, Colin was in the guest bedroom folding laundry. Mr. Koogler walked past and entered his and Karolyn's bedroom where, according to Colin, he immediately began yelling. Colin heard Mr. Koogler yell at Karolyn about a $30,000 debt and that "she was useless and nobody would want her." RP (Oct. 29, 2018) at 58. Mr. Koogler accused her and her family of leaving him to walk home through a snowbank, and yelled, "If you ever do [that] again, I will kill you." *Id.* at 59. Colin then heard the sound of a shotgun being racked coming from the Kooglers' bedroom. When he heard the shotgun racked a second time, he ran out of the house and called police. *Id.*

According to Karolyn, when Mr. Koogler entered their bedroom, she was lying in bed but was not asleep. She would later testify that as he entered, he switched on the ceiling light and yelled, "You are a dumb fucking bitch. You are so fucking stupid, bitch,

cunt. Nobody will ever want you. You are such a fucking dumb bitch, you are fucking dead meat and I want to fucking kill you." RP (Oct. 26, 2018) at 143, 151. She was scared and pretended to be asleep.

Karolyn would later testify that as Mr. Koogler continued to insult her, he picked up a shotgun that he kept on his side of the bed, racked it a couple times, and said "'Does this sound real, fucking bitch? I'm going to fucking kill you.'" RP (Oct. 26, 2018) at 144-45. She claims he also pushed the muzzle of the gun into her back for 30 seconds to a minute and said, "'Does this feel fucking real, bitch? I'm going to fucking kill you.'" *Id.* at 147. Karolyn did not know if the gun was loaded. She testified that as it was held to her back, she feared Mr. Koogler was going to kill her. She tried to be very still because she thought "if I do anything to provoke him, who knows, he—it would have probably gone off." *Id.* at 149.

It was around 10:30 p.m. when four Spokane County sheriff's officers responded to the report of a domestic violence incident with a weapon involved. They waited outside and watched the Kooglers' bedroom window as dispatch called the Kooglers' phone numbers, attempting to make contact. Mr. Koogler answered one of the calls and at the dispatcher's request gave the phone to Karolyn, who was told to leave the house immediately. She did, and was moved to a safe location by one of the officers. Mr. Koogler then came out and was placed into handcuffs. One of the officers described him as physically cooperative but "obviously intoxicated." RP (Oct. 29, 2018) at 79.

5

According to Karolyn, as the officers were leading Mr. Koogler away from the home, he looked at her and said, "You're fucking dead meat as soon as I get out, bitch." RP (Oct. 26, 2018) at 159.

Mr. Koogler was charged with second degree assault with a deadly weapon against a family member and harassment with a threat to kill against a family member. The State later amended the information to add a firearm enhancement to each count.

At trial, the State called as witnesses Colin, Karolyn, and three of the responding officers. They testified to the events of December 29. Although the officers testified that Mr. Koogler yelled at Karolyn as he was being led away from the home, none of them corroborated her testimony that he had threatened violence against her "[when] I get out." One testified that Mr. Koogler had said, "You're dead meat." RP (Oct. 26, 2018) at 207.

Mr. Koogler was the sole defense witness. He testified that when he entered his and Karolyn's bedroom, he saw her lying on her stomach, "stiff as a board with her fists clenched," and he knew she was not asleep. RP (Oct. 26, 2018) at 239. He claimed he asked her twice why she left him, but she did not respond. He admitted he was intoxicated and angry because he "thought [he]'d been abandoned that afternoon, and [he] had to walk through the snow." *Id.* at 240.

He testified he never pointed his shotgun at Karolyn or held it to her back. He admitted he picked up the shotgun and racked it twice, but testified that this was only to

make sure it was unloaded because it was not where he normally kept it, which concerned him.

Mr. Koogler testified that he realized later, by looking at his phone, that both Karolyn and Colin had tried to reach him during the afternoon and evening. He admitted he had been a "drunken asshole" and testified that if he had not been arrested and realized the next morning that he was not abandoned he would have apologized. RP (Oct. 26, 2018) at 247.

In detailing how he racked the shotgun, Mr. Koogler testified that he had "picked the gun up, pointed it up in the air. I racked it, checked the chamber with my finger. I checked the elevator. I then checked the magazine. I slammed it shut, racked it open again." *Id.* at 245. He testified that when racking the shotgun, he had said, "'this sounds real loud, doesn't it.'" *Id.* at 246. The prosecutor explored that statement on cross-examination, eliciting the following testimony:

Q      And it's your testimony that what you said after racking the shotgun, I guess the first time, was "this sounds real loud now, doesn't it?"

A      I believe what it should have been was "this sounds real loud."

Q      Sounds real loud.
         Why did you say that?

A      I wanted Karolyn to say something.

Q      So you were drawing her attention to the fact that you had a shotgun, right?

A      I just said that. I presumed she knew I had it when I racked it.

Q      But then you said, "This sounds real loud"?

7

A       I wanted a reaction.  I wanted her to talk to me.

Q       While upset and intoxicated and threatening her—

[DEFENSE COUNSEL]:  Objection.  That's argumentative.

THE COURT:  Overruled.

Q       (By [THE PROSECUTOR])—you wanted to make sure she knew you had the shotgun and you wanted to get her attention so she'd talk to you?

A       I just wanted her to talk to me.

*Id.* at 266-67.

Mr. Koogler admitted saying to Karolyn while in the bedroom, "[i]f you ever do this again, I'll kill you," with "this" meaning abandoning him.  *Id.* at 247.  He testified he was not joking when he said it, but he did not mean it.  Mr. Koogler did not recall saying any of the other things Karolyn alleged, but said he may have told her she was "'so fucking stupid.'"  *Id.* at 248.  He denied that once outside the home, he had ever said to Karolyn "'you're fucking dead meat as soon as I get out, bitch.'"  *Id.* at 252.  Rather, he testified, he had told Karolyn, "'We're through.'"  *Id.* at 253.

In closing argument, the prosecutor reminded the jury of Mr. Koogler's testimony that he had wanted a reaction from Karolyn when he commented, as racking the shotgun, that it "sounds real loud."  He told the jury "the truth kind of came out a little bit" with that answer, and, "He's making that noise to create a reaction, to create a fear in Karolyn. I mean, there's no way around it."  *Id.* at 310-11.

8

The jury found Mr. Koogler guilty of the assault count, but acquitted him of

harassment (threat to kill). His motion to arrest the judgment was denied. The trial court

sentenced Mr. Koogler to a term of total confinement of 39 months, consisting of a three

month sentence for the assault (the low end of the standard range) plus 36 months for the

firearm enhancement. Mr. Koogler appeals.

ANALYSIS

Mr. Koogler challenges the sufficiency of the evidence to establish the intent

required for assault, and contends he received ineffective assistance of counsel when his

trial lawyer failed to have him clarify his testimony about why he said "this sounds real

loud."

I.    THE EVIDENCE WAS SUFFICIENT

The jury was properly instructed that

> [a]n assault is an act done with the intent to create in another apprehension
> and fear of bodily injury and which, in fact, creates in another a reasonable
> apprehension and imminent fear of bodily injury even though the actor did
> not actually intend to inflict bodily injury.

RP (Oct. 26, 2018) at 285-86 (Instruction 7). Mr. Koogler contends there was

insufficient evidence to support the jury's implicit finding that he intended to create in

Karolyn apprehension and fear of bodily injury.

As a threshold matter, we reject Mr. Koogler's argument that because he was

acquitted of the harassment count, the jury must not have believed Karolyn's testimony

9

and its verdict must necessarily have been based on a misapprehension of *his* testimony. The offenses have different elements, so the verdicts are not inconsistent. Harassment (threat to kill) focuses on Mr. Koogler's alleged threats to kill Karolyn and whether, in the context and circumstances, a reasonable person in Mr. Koogler's position would foresee that the threat would be interpreted as serious. *See id.* at 287 (Instruction 12). Assault could be found based on evidence that Mr. Koogler racked a gun, placed its muzzle on Karolyn's back, and asked her loudly whether it sounded "real" or "loud." Moreover, even inconsistency would not necessarily require reversal, because "[j]uries return inconsistent verdicts for various reasons, including mistake, compromise, and lenity." *State v. Goins*, 151 Wn.2d 728, 733, 92 P.3d 181 (2004). Because it is generally difficult to discern "which was the verdict that the jury 'really meant,'" courts will uphold a conviction despite a conflicting acquittal if there is sufficient evidence to support the jury's guilty verdict. *Id.*

In testing for the sufficiency of the evidence, then, we assume that Karolyn's testimony was believed. The test for sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All reasonable inferences from the evidence are drawn in favor of the State and are interpreted strongly against the defendant. *Id.* "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably

can be drawn therefrom." *Id.* This court's role is not to reweigh the evidence and substitute its judgment for that of the trier of fact. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). "Credibility determinations are for the trier of fact and are not subject to review." *State v. Mines*, 163 Wn.2d 387, 391, 179 P.3d 835 (2008).

Whether Mr. Koogler had the criminal intent to assault Karolyn resides exclusively within his mind, "but it may be proved by facts and circumstances more readily perceived by others." *State v. Bencivenga*, 137 Wn.2d 703, 710, 974 P.2d 832 (1999). "Nothing forbids a jury, or a judge, from logically inferring intent from proven facts, so long as it is satisfied the state has proved that intent beyond a reasonable doubt." *Id.* at 709. Appellate courts will not "invade the province of the fact finder by appropriating . . . the role of factually determining the reasonableness of an inference." *Id.* at 708.

A jury may infer intent to create apprehension of bodily injury from the defendant's pointing a gun at the victim, unless the victim knew the weapon was unloaded. *State v. Eastmond*, 129 Wn.2d 497, 500, 919 P.2d 577 (1996). Here, not only is Mr. Koogler alleged to have pointed the gun and placed it in Karolyn's back, but by his own admission, he was angry and racked the gun loudly, twice. By all accounts other than his own, he was yelling at her, and both Colin and the testifying officers heard him make threats of several sorts. Sufficient evidence supports an inference of criminal intent.

11

II.     INEFFECTIVE ASSISTANCE OF COUNSEL IS NOT SHOWN

Mr. Koogler argues his attorney provided ineffective assistance when he failed to ask clarifying questions so that Mr. Koogler could explain what he meant when he testified that in saying to Karolyn, "this sounds real loud," was to get a reaction.

To succeed on a claim of ineffective assistance of counsel, a defendant must establish that defense counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness, and the deficient representation prejudiced the defendant, i.e., there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). If a party fails to demonstrate one element, a reviewing court need not analyze the other. *State v. Foster*, 140 Wn. App. 266, 273, 166 P.3d 726 (2007). Both prongs must be established based on facts in the record developed below. *McFarland*, 127 Wn.2d at 335-37.

Courts are highly deferential to counsel's decisions and there is a strong presumption that counsel performed adequately. *Strickland v. Washington*, 466 U.S. 668, 689-91, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "[C]ounsel's performance is adequate as long as his challenged decisions '*can be characterized* as legitimate trial strategy or tactics.'" *State v. Carson*, 184 Wn.2d 207, 221, 357 P.3d 1064 (2015) (quoting *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009)). Defendants must "affirmatively prove prejudice." *Strickland*, 466 U.S. at 693.

12

The problem with Mr. Koogler's ineffective assistance claim is that it is easy to conclude that trial counsel made a tactical decision not to question Mr. Koogler further because of the risk that further questions and answers might hurt, not help. With the benefit of hindsight, Mr. Koogler apparently now believes that his answers in cross-examination were partly truthful and helpful (the "wanting Karolyn to talk to me" part) and partly unartful and misunderstood (the "wanting to get a reaction" part). Even if defense counsel immediately foresaw peril from Mr. Koogler's "wanting to get a reaction" testimony, however, spending more time on what Mr. Koogler said and thought while angrily and drunkenly racking a shotgun presented its own peril. And, of course, the prosecutor would have had the right to cross-examine Mr. Koogler further about his "wanted a reaction" answer. Avoiding reemphasizing unfavorable evidence is a legitimate trial tactic that cannot be the basis of a claim of ineffective assistance of counsel. *State v. Kloepper*, 179 Wn. App. 343, 355-56, 317 P.3d 1088 (2014). Mr. Koogler fails to demonstrate either deficient representation or prejudice.

STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds for review (SAG), Mr. Koogler raises six.

*Law enforcement investigation.* Mr. Koogler contends that law enforcement failed to conduct a complete investigation because they had cameras in their patrol cars and,

13

having been told by Karolyn that a shotgun had been held forcefully against her back, did not document the presence or absence of marks or bruises on her back.

Due process does not require law enforcement to search for exculpatory evidence. *State v. Armstrong*, 188 Wn.2d 333, 345, 394 P.3d 373 (2017). Failure to preserve evidence only violates due process where the State acts in bad faith. *Id.* Mr. Koogler has not alleged or established bad faith.

*Karolyn's testimony.* Mr. Koogler argues Karolyn knew that the gun was unloaded and her own testimony established that she had the opportunity to leave if she felt threatened. We will not reweigh evidence or substitute our own judgment for that of the jury. *Green*, 94 Wn.2d at 221.

*Insufficient evidence of Mr. Koogler's intent.* Mr. Koogler argues he was justifiably checking the shotgun out of concern when he saw it had been moved, and the State failed to prove an intent to assault. This issue was adequately addressed by counsel and will not be reviewed again. *See* RAP 10.10(a).

*Juror Bias.* Mr. Koogler argues that a juror should have "recused herself" because she was a nurse who worked for the same company as Karolyn, so she may have been acquainted with Karolyn or had prior knowledge of the events. SAG at 2. He claims he expressed concern to his lawyer about the juror. Since the matter he now complains of was recognized in the trial court, the defense needed to raise any objection at that time. The issue was not preserved. *See* RAP 2.5(a).

14

*Inadequate time to prepare for trial.* Mr. Koogler argues his rights under the Sixth Amendment to the United States Constitution were violated when on a Friday afternoon, after a potential plea bargain fell apart, the court ordered trial to begin the following Monday morning. He claims he lost co-counsel as a result of the scheduling. Mr. Koogler never asked for a continuance, so any claim that one was needed was not preserved. RAP 2.5(a). He does not allege a deficiency in performance or prejudice as the basis for an ineffective assistance of counsel claim.

*Sentence.* Mr. Koogler states in passing that he feels his sentence is excessive. A defendant generally cannot appeal a standard range sentence, *see* RCW 9.94A.585(1), and Mr. Koogler identifies no basis for an exception.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____          _____
Fearing, J.                                                    Pennell, C.J.