# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  55793-2-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| NEIL ALLEN ALWAY, | |
| Appellant. | |

PRICE, J. — Neil Alway appeals his convictions for first degree murder, second degree murder, first degree kidnapping, and first degree robbery, with firearm enhancements for each. Alway argues that (1) the State committed prosecutorial misconduct for using the nickname "Pit Bull" during trial and closing argument, (2) he received ineffective assistance of counsel for his defense counsel's failure to object to the use of the nickname at trial and closing argument, (3) the sentencing court erred in sentencing his first degree murder and first degree kidnapping convictions consecutively as separate and distinct criminal conduct, and (4) his judgment and sentence has scrivener's errors that require correction.  Alway also raises additional issues in a statement of additional grounds.  We affirm Alway's convictions, but remand to the trial court to correct the scrivener's errors in the judgment and sentence.

FACTS

I. BACKGROUND FACTS

In mid-April 2017, Alway's friend, Cheryl Penticoff, told him her ex-boyfriend, Raymond Brandon, and his then girlfriend Allison Fields, were living in Penticoff's car and she wanted it returned. Alway said he would get the car back for her.

One week later, on the morning of April 20, Alway was at a friend's house, smoking meth, with a group of people. The home belonged to Traci Mendez, who was there that morning. Also present were Ashley Barry, John West, and Ashley Wideman. Mendez, who would often allow Brandon and Fields to use her home to eat, sleep, and use meth, informed the group that Brandon and Fields would be coming over that morning in Penticoff's car. The group discussed plans to recover Penticoff's car, including the possibility of assaulting Brandon.

Alway, Barry, West, and Wideman hid in the back room of Mendez's home to wait for Brandon and Fields to arrive. Alway was armed with a handgun, and West was armed with a wooden bat.

Once Brandon and Fields arrived at the Mendez home, they made their way to the back room and were confronted by the group. Alway held Brandon and Fields at gunpoint and yelled at them to kneel down, remove their clothing, and empty their pockets. Alway then disarmed Brandon of a gun and handed it to West. Alway and West then forced Brandon at gunpoint to walk outside the home to a shed in the backyard. Berry, Wideman, Mendez, and Fields remained inside the home.

Once inside the shed, Brandon tried to get his gun back, causing Alway and West to begin to brutally beat Brandon. The screaming became so loud that Berry came out of the house to tell

Alway and West to keep the noise down. After Berry returned inside, Alway took out his gun and shot Brandon in the chest, killing him.

Alway and West then ran back inside the house and hurriedly left with the group, along with Fields, in Mendez's car. Fields, who did not want to be with the group, eventually managed to escape later that day.

Soon after escaping, Fields went to Brandon's family and told them what she suspected happened. Brandon's family called the police several times over the next few days. Law enforcement opened a missing person's investigation and were in the process of executing a search warrant for Mendez's home when Brandon's body was found in the shed one week after the attack.

Five days later, unrelated to the murder, Alway and Berry were arrested for driving a car with stolen license plates. At the time of the arrest, Alway was in possession of the handgun that killed Brandon. After Brandon's body was discovered, Alway was questioned by law enforcement regarding the murder. While Alway admitted to being at the Mendez's home on the day of the attack, he maintained that Brandon was still alive when he left.

The State charged Alway, West, Wideman, and Barry with various crimes, including murder, kidnapping, robbery, and rendering criminal assistance. In its third amended information, the State charged Alway with first and second degree murder of Brandon (Counts 1 and 2), first degree kidnapping of Fields and Brandon (Counts 3 and 4), and first degree robbery of Fields and Brandon (Counts 5 and 6), with firearm sentencing enhancements for all counts.

II. JURY TRIAL

A. TESTIMONY

Alway's case proceeded to a lengthy jury trial. The State called over 50 witnesses and admitted over 500 exhibits during trial. West, Wideman, and Mendez entered into plea agreements and testified against Alway at trial, consistent with the facts above.

Wideman also offered additional testimony that after she heard a gunshot, Alway and West frantically ran inside the house, yelling at everyone to leave. She asked West where Brandon was, and West responded that Brandon was gone, pointed to his chest, and said that it was an accident.

West also testified, stating he understood there would be either a verbal or physical confrontation once Brandon arrived, but that there was "not exactly" a discussion of "what exactly was going to go down" when Brandon arrived at the house. 4 Verbatim Report of Proceedings (VRP) (Apr. 1, 2021) at 1652. West testified that after Alway shot Brandon, Alway yelled, "I [f**ked] up" and ran, panicked, into the house, yelling at the rest of the group that they needed to get out. 4 VRP (Apr. 1, 2021) at 1660.

Fields also testified. She testified she previously knew Alway through Brandon, and that Alway had the nickname Pit Bull. 1 VRP (Mar. 24, 2021) at 438. Throughout her testimony, Fields referred to Alway only as Pit Bull, using the reference 23 times. The prosecutor referred to Alway as Pit Bull 13 times when questioning Fields (and defense counsel used the nickname twice during his questioning of Fields). Alway did not object to the use of Pit Bull during Fields' testimony or when used by the prosecutor. Fields was the only witness to use Pit Bull consistently during her testimony; most of the numerous other witnesses never referenced the nickname.

Six police officers testified about various aspects of the arrests of Alway and Berry for driving a stolen vehicle five days after the murder. They explained how they received information that Alway was driving a stolen vehicle and pursued him in a Vancouver neighborhood, eventually arresting him and Berry. They testified Alway possessed a handgun when he was arrested. The officers testified the Clark County Sheriff's Office contacted them a few days after their arrest of Alway to notify them about the murder. The officers then testified about the process of turning over the evidence found on Alway to the sheriff's office, including the handgun. Alway did not object to the officers' testimony.

A medical examiner testified that Brandon died from a gunshot wound that severed his aorta. A firearm and toolmark forensic scientist testified she was "100 [percent] confident" the handgun found in Alway's possession at the time of his arrest matched the bullet found in Brandon's body and the shell casing found inside the shed. 4 VRP (Apr. 1, 2021) at 1750. A DNA expert testified Alway's DNA was found on the gun that killed Brandon and on rope found tied around Brandon's hands.

B. CLOSING ARGUMENT

During the State's closing argument and rebuttal, the State referred to Alway as Pit Bull seven times. The State used the nickname when he was identifying Alway, including five times when he was identifying who was involved in the attack.

But the State otherwise referred to Alway only as "the defendant" or by his proper name. The label "defendant" was used over 50 times. Alway did not object to the use of the nickname during closing argument.

5

III. VERDICT AND SENTENCING

The jury found Alway guilty on all counts and firearm sentencing enhancements.

At sentencing, the State sought to have Count 3, Brandon's kidnapping conviction, run consecutively with Count I, Brandon's murder conviction. The State argued Alway's conduct for first degree murder and first degree kidnapping of Brandon were separate and distinct criminal conduct because the offenses had different criminal intents and the offenses occurred in two different locations. Accordingly, the State argued RCW 9.94A.589(1)(b)[1] required the respective sentences to run consecutively. Alway responded the offenses were all part of one event and, therefore, not separate and distinct criminal conduct.

The trial court agreed with the State, stating, "The murder count and the kidnap counts are separate and distinct conduct. That's the finding of the [c]ourt at this time. Two different intents and in the case of Ms. Fields, two different victims." 5 VRP (May 7, 2021) at 2283. The trial court sentenced Alway to 850 months confinement, to run consecutively with two prior offenses.[2]

Alway appeals.

---

[1] Sentences involving "two or more serious violent offenses arising from separate and distinct criminal conduct" are to be served consecutively.

[2] Alway was sentenced to nine months confinement for second degree burglary in 2016, which, according to the State, he had not served (Clark County cause number 15-1-02306-3). According to the State, Alway was already serving a sentence for possession of a stolen vehicle and unlawful possession of a firearm at the time of his conviction (Clark County cause number 17-1-00899-1). The trial court stated at sentencing the current sentence "will run consecutive to 15 and 17 cause numbers." 5 VRP (May 7, 2021) at 2288.

ANALYSIS

I. PROSECUTORIAL MISCONDUCT

Alway argues the State committed prosecutorial misconduct when it elicited testimony from Fields regarding Alway's nickname during trial and again used the nickname during closing statement. We disagree.

A. LEGAL PRINCIPLES

To prevail on a claim of prosecutorial misconduct, a defendant must first demonstrate that the prosecutor's statements were improper and, second, that they were prejudicial. *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008). We examine improper conduct in the full trial context, "including the evidence presented, 'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.' " *State v. Monday*, 171 Wn.2d 667, 675, 257 P.3d 551 (2011) (internal quotation marks omitted) (quoting *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)).

When a defendant fails to object to a prosecutor's statements at the trial court level, a waiver is presumed unless the defendant can show that the statements were so flagrant and ill-intentioned that no instruction could have cured them. *State v. Warren*, 165 Wn.2d 17, 30, 195 P.3d 940 (2008), *cert. denied*, 556 U.S. 1192 (2009). "When a nonobjecting defendant fails to show that the improper remarks were incurable, the claim 'necessarily fails, and our analysis need go no further.' " *State v. Gouley*, 19 Wn. App. 2d 185, 201, 494 P.3d 458 (2021) (quoting *State v. Emery*, 174 Wn.2d 741, 764, 278 P.3d 653 (2012)), *review denied*, 198 Wn.2d 1041 (2022). Prejudice occurs when " 'within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred.' " *State v. Weber*, 159 Wn.2d 252, 270, 149 P.3d

646 (2006) (internal quotation marks omitted) (quoting *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997)), *cert. denied*, 551 U.S. 1137 (2007); *see also State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009) (prejudice requires there to be "a substantial likelihood the improper conduct affected the jury"). Our analysis focuses more on whether the prejudice could have been cured and less on whether the prosecutor's misconduct was flagrant and ill-intentioned. *Gouley*, 19 Wn. App. 2d at 201.

A prosecutor "has wide latitude in closing argument to draw reasonable inferences from the evidence . . . ." *State v. Lewis*, 156 Wn. App. 230, 240, 233 P.3d 891 (2010). But a "prosecutor must 'seek convictions based only on probative evidence and sound reason.' " *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012) (quoting *State v. Casteneda-Perez*, 61 Wn. App. 354, 363, 810 P.2d 74 (1991)). Prosecutors must refrain from using arguments meant to appeal to the jury's passion and prejudice to render a verdict, rather than the evidence presented. *State v. Belgarde*, 110 Wn.2d 504, 507, 755 P.2d 174 (1988).

ER 403 provides relevant evidence " 'may be excluded if its probative value is *substantially* outweighed by the danger of unfair prejudice . . . .' " *Wilson v. Olivetti N. Am., Inc.*, 85 Wn. App. 804, 813, 934 P.2d 1231 (emphasis added) (quoting ER 403), *review denied*, 113 Wn.2d 1017 (1997). Prejudicial evidence is evidence that is "likely to stimulate an emotional response instead of a rational decision." *State v. Scherf*, 192 Wn.2d 350, 388, 429 P.3d 776 (2018). Prejudicial evidence "is not inadmissible merely because it is harmful to the party opposing its admission." *Id.*

Prejudicial nicknames can be admissible if the witness only knew the defendant by that nickname, or if forbidding the witness from using the nickname would have been unduly

burdensome on the witness. *State v. Rodriguez*, 163 Wn. App. 215, 230, 259 P.3d 1145 (2011), *review denied*, 173 Wn.2d 1009 (2012). In *Rodriguez*, the defendant argued the probative value of his street name, Little Evil, was substantially outweighed by its prejudicial nature. *Id.* at 229. The court decided it was not error for the trial court to allow certain lay witnesses to refer to the defendant by Little Evil because those witnesses only knew the defendant by this name, and therefore, its use was unavoidable. *Id.* The court relied on federal cases that decided prejudicial nicknames were admissible if witnesses only knew the defendant by that name or if forbidding the witness to use the nickname would be unduly burdensome. *See United States v. Farmer*, 583 F.3d 131, 146 (2d Cir. 2009) (deciding it was not error for most of the defendant's convictions when the government elicited testimony about the nickname from witnesses who knew the defendant by his nickname, Murder); *see also United States v. Hattaway*, 740 F.2d 1419, 1425 (7th Cir. 1984) (forbidding a witness from using the nicknames she only knew other gang members by would be unduly burdensome for her testimony).

B. APPLICATION

Alway argues the State committed prosecutorial misconduct in two instances related to the nickname Pit Bull: first, when Fields used the nickname during her testimony as elicited by the State and second, during the State's closing argument. Alway further argues the State's use of the nickname in closing argument was a flagrant and ill-intentioned appeal to the jury's emotions and passions that could not have been cured with an instruction.

1. Use of "Pit Bull" During Fields' Testimony

Alway first argues that when the State elicited the use of the nickname by Fields during her testimony, the term was overly prejudicial because it is suggestive of animals that are typically

associated by some people with aggression and violence. Alway alleges the use of this nickname would cause the jury to unfairly attribute those negative characteristics to him.

However, during Fields' testimony, the nickname was largely used as an identifier. Even if modestly prejudicial, Fields' use of the nickname as an identifier was relevant when, as here, the record suggests that is how Fields was accustomed to referring to Alway. *See Rodriguez*, 163 Wn. App. at 230. That relevant and permissible use of the nickname outweighs any resulting prejudice, especially considering the nickname is well-short of the offensiveness and prejudicial effect of the nicknames of "Little Evil" or "Murder."[3] Fields' use was not error, and therefore, there was no prosecutorial misconduct for the State's role in soliciting the nickname.

Furthermore, even if it could be characterized as misconduct for the State to participate in this testimony by Fields, Alway cannot show that it was so flagrant and ill-intentioned that a curative instruction would not have been sufficient. Considering the nickname was admissible as an identifier by Fields, if defense counsel had objected, the use of the nickname would not likely have been stricken in its entirety. If anything, the trial court may have limited the jury's consideration of the nickname to the identification of Alway. Alway cannot show that such an instruction would not have been sufficient to prevent any unfair prejudice.

In sum, the use of the nickname by Fields as an identifier was not improper and any prejudice could have been cured by an instruction. Therefore, the prosecutor did not commit misconduct when he elicited testimony from Fields.

---

[3] While it is possible that a juror could associate the nickname "Pit Bull" with the image of an aggressive dog, it is equally possible that a juror could have associated the name with the well-known rap-music entertainer who goes by that same name.

2. Use of "Pit Bull" During Closing Argument

Alway's second related argument is that the State committed prosecutorial misconduct when it used the nickname during closing argument.

However, as explained above, the nickname was admissible as an identifier for Alway during the trial testimony of Fields. And a prosecutor is free to refer to admitted evidence in closing. *See, e.g., State v. Brown*, 132 Wn.2d 529, 567, 940 P.2d 546 (1997) (prosecutor's reading from tape transcript of defendant's statements was proper because the tapes had been admitted into evidence at trial), *cert. denied*, 523 U.S. 1007 (1998). With the admissibility of the nickname as an identifier during Fields' testimony, the State was generally permitted to use the nickname unless the State strayed from its permissible use as an identifier into the forbidden territory of appealing to the jury's passion or prejudice. *See Farmer*, 583 F.3d at 146-47 (in homicide trial, "main problem" was not admission of prejudicial nickname "Murder," it was the prosecutors' "frequently repeated, gratuitous invocation" of the nickname).

Here, looking at the State's closing argument, the use of the nickname stops short of misconduct for two reasons. First, the State used the nickname seven times in the course of its lengthy closing, each time using the nickname as an identifier for Alway—twice to refer to him directly and five times to identify him as the person involved in the attack. Importantly, at no point did the State use any language evoking an image of a vicious animal in conjunction with the nickname. Indeed, absent from the State's closing argument is any language paralleling Alway's actions to that of an animal.

Second, as discussed above, the nickname itself does not carry a grossly negative connotation, like "Little Evil" and "Murder," and its use here was wholly dissimilar to other

11

improper appeals to passion or prejudice, like racially charged language and rhetoric. *See Belgarde*, 110 Wn.2d at 507 (holding language alluding to the defendant's association with the American Indian Movement was akin to the Irish Republican Army was flagrant); *see also Monday*, 171 Wn.2d at 675 (holding intentional comments appealing to racist stereotypes was flagrant and ill-intentioned).

But even if the State's closing was misconduct, just as with the Fields' testimony, defense counsel made no objection. Therefore, Alway must show that the State's actions were so flagrant and ill-intentioned that resulting prejudice could not be cured by an instruction. Like the nickname's use in the Fields' testimony, Alway cannot make this showing because an instruction could have cured the misconduct. Accordingly, we hold that Alway has failed to show prosecutorial misconduct.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Alway argues defense counsel acted deficiently when he failed to object to the use of Alway's nickname during trial and closing argument.[4] Specifically, Alway argues he received ineffective assistance of counsel because his defense counsel failed to properly research the prejudicial effect of nicknames and apply the rules of evidence accordingly. We disagree.

---

[4] The State argues that because Alway failed to object to the use of his nickname during trial, unless he can show the error was a manifest constitutional error, he is precluded from raising the issue on appeal under RAP 2.5(a). We may review the arguments under an ineffective assistance of counsel claim, regardless of whether the error is of manifest constitutional right. *See State v. Gerdts*, 136 Wn. App. 720, 726, 150 P.3d 627 (2007).

A. LEGAL PRINCIPLES

To show they received ineffective assistance of counsel, a defendant must show that the attorney's performance was deficient and that the deficiency prejudiced the appellant. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) (known as the "Strickland test"); *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 35, 296 P.3d 872 (2013). Failure to establish either prong is fatal to the claim. *Strickland*, 466 U.S. at 700.

Counsel's performance is deficient if it falls below an objective standard of reasonableness. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011), *cert. denied*, 574 U.S. 860 (2014). Defense counsel's performance is not deficient if it is a legitimate trial tactic. *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009). "The decision of when or whether to object is a classic example of trial tactics." *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662, *review denied*, 113 Wn.2d 1002 (1989). We engage in a strong presumption that counsel's performance was reasonable. *Grier*, 171 Wn.2d at 33.

For ineffective assistance of counsel claims centered on the attorney's failure to object, the defendant " 'must show that the objection would likely have succeeded.' " *State v. Vazquez,* 198 Wn.2d 239, 248, 494 P.3d 424 (2021) (quoting *State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541 (2019)). The failure to object justifies reversal "[o]nly in egregious circumstances, on testimony central to the State's case." *Crow*, 8 Wn. App. 2d at 508. Defense counsel performs deficiently if they fail to object to inadmissible evidence. *Vazquez*, 198 Wn.2d at 248.

Lastly, a defendant must show they were prejudiced by defense counsel's deficiency. *Grier*, 171 Wn.2d at 34. "To satisfy the prejudice prong of the *Strickland* test, the defendant must establish that 'there is a reasonable probability that, but for counsel's deficient performance, the

outcome of the proceedings would have been different.' " *Grier*, 171 Wn.2d at 34 (quoting *Kyllo*, 166 Wn.2d at 862). If defense counsel failed to object to inadmissible evidence, "reversal is required if the defendant can show the result would likely have been different without the inadmissible evidence." *Vazquez*, 198 Wn.2d at 248-49.

B.   APPLICATION

Alway argues he received ineffective assistance of counsel because his defense counsel failed to perform basic research that would have led to an objection for the use of the nickname Pit Bull during trial. Alway argues his nickname was inadmissible under ER 401, 403, and 404 and there was no tactical reason to not object to the use of the nickname. Alway also argues he was prejudiced because the State distracted and impassioned the jury by misusing the nickname.

1.  Use of "Pit Bull" During Fields' Testimony

As for his counsel's failure to object during Fields' testimony, in order to succeed in his ineffective assistance of counsel claim, Alway must show an objection to the use of the nickname during this testimony would have been successful. As explained above, Alway's nickname was admissible as an identifier during Fields' testimony. Because of its admissibility, Alway cannot show an objection would have been successful, and thus, was not deficient performance. Therefore, Alway fails to show he received ineffective assistance of counsel for failure to object to the nickname during this testimony.

2.  Use of "Pit Bull" During Closing Argument

As for his counsel's failure to object during the State's closing, the State has wide latitude to refer to admitted evidence and, due to its limited use, the State's use of the nickname fell short

of impermissibly appealing to passion or prejudice. The State referred to Alway as "the defendant" over 50 times in its lengthy closing and used the nickname only seven times.

But even if defense counsel could have succeeded in convincing the trial court to sustain an objection to the nickname, Alway cannot show he was prejudiced by his counsel's deficient performance. There was overwhelming evidence for the jury to convict Alway. For example, West testified he saw Alway shoot Brandon, the medical examiner testified Brandon died from a gunshot wound, the forensic examiner testified Alway's gun was used to shoot Brandon, and the DNA expert testified Alway's DNA was found on rope tied around Brandon's hands and on the gun that killed Brandon. Given this evidence against Alway, it is unlikely that the use of the nickname had any material effect on the outcome of the trial. *See, e.g., Farmer,* 583 F.3d at 147 ("Given the strength of the government's evidence, there can be no doubt that [the defendant] would have been convicted on [multiple counts] even if he had no nickname [of Murder].").

We conclude that Alway did not receive ineffective assistance of counsel. Alway cannot show deficient performance because an objection from his counsel would not have been successful to exclude the use of the nickname, and he cannot show he was prejudiced.

III. SEPARATE AND DISTINCT CRIMINAL CONDUCT

Alway argues the sentencing court erred in sentencing him to consecutive sentences for first degree murder and first degree kidnapping of Brandon (Counts 1 and 4) because the offenses were not separate and distinct criminal conduct. We disagree.

A. LEGAL PRINCIPLES

A person "convicted of two or more serious violent offenses arising from separate and distinct criminal conduct" must serve those sentences consecutively. RCW 9.94A.589(1)(b).

"Crimes that do not constitute the same criminal conduct are necessarily separate and distinct offenses." *State v. Kloepper*, 179 Wn. App. 343, 356, 317 P.3d 1088, *review denied*, 180 Wn.2d 1017 (2014). Two or more crimes have the same criminal conduct if they "require the same criminal intent, are committed at the same time and place, and involve the same victim." RCW 9.94A.589(1)(a); *State v. Valencia*, 2 Wn. App. 2d 121, 125, 416 P.3d 1275 (2018). If one of the elements is not met, the crimes are not the same criminal conduct. *Id.* The statute is narrowly construed to "disallow most claims that multiple offenses constitute the same criminal act." *State v. Porter*, 133 Wn.2d 177, 181, 942 P.2d 974 (1997). The defendant bears the burden of establishing the offenses are the same criminal conduct. *State v. Graciano*, 176 Wn.2d 531, 541, 295 P.3d 219 (2013).

Offenses have the same criminal intent if, when objectively viewed, the intent does not change between the two offenses. *Kloepper*, 179 Wn. App. at 357. Criminal intent is the defendant's "objective criminal purpose in committing the crime." *State v. Adame,* 56 Wn. App. 803, 811, 785 P.2d 1144, *review denied*, 114 Wn.2d 1030 (1990). We examine whether the objective criminal intent changed from one crime to the next. *State v. Tili*, 139 Wn.2d 107, 123, 985 P.2d 365 (1999). "Crimes may involve the same criminal intent if they were part of a 'continuing, uninterrupted sequence of conduct.' " *State v. Munoz-Rivera*, 190 Wn. App. 870, 889, 361 P.3d 182 (2015) (quoting *Porter*, 133 Wn.2d at 186). "But when an offender has time to 'pause, reflect, and either cease his criminal activity or proceed to commit a further criminal act,' and makes the decision to proceed, he or she has formed a new intent to commit the second act." *Id.* (quoting *State v. Grantham*, 84 Wn. App. 854, 859, 932 P.2d 657 (1997)).

Offenses that occur as part of a continuing, uninterrupted sequence of conduct occur at the same time for sentencing purposes. *Porter*, 133 Wn.2d at 186. The offenses are not required to have occurred simultaneously to be considered the same criminal conduct. *Id.* at 183, 185-86. But offenses do not occur at the same time if the defendant cannot show the offenses were continuous, or occurred in a short time frame. *Graciano*, 176 Wn.2d at 541.

We review a trial court's ruling on whether two or more crimes are the same criminal conduct for an abuse of discretion or misapplication of the law. *Id.* at 536. A trial court abuses its discretion "when the record supports only one conclusion" and the trial court arrives at a "contrary result." *Id.* at 537-38. When a record supports either determination, there is no abuse of discretion. *Id.* at 538.

B. APPLICATION

Alway argues first degree murder and first degree kidnapping were not separate and distinct criminal conduct because the crimes involved the same criminal intent, which was to restrain and kill Brandon. Because he intentionally abducted Brandon with the intent to commit murder, Alway asserts consecutive sentences were not required under RCW 9.94A.589(1)(b). We disagree.

The kidnapping began almost immediately when Brandon first arrived at the house when Alway held Brandon at gunpoint. This kidnapping was consistent with the collective discussions of the group and was designed to get Penticoff's car back. But there was no evidence the group discussed or intended to kill Brandon or that Alway had any intentions separate from that of the group. In fact, West testified the group had no real plan on how to get the car back, other than possibly physically confronting Brandon.

17

The evidence shows Alway only began brutally beating Brandon when Brandon began to attempt to get his gun back, and only killed Brandon after Barry told them they were being too loud. West testified that Alway yelled, "I [f**ked] up" right after he shot Brandon, and West told Wideman the shooting was an accident. 4 VRP (Apr. 1, 2021) at 1660. Both West and Wideman testified Alway was panicked and frantic after shooting Brandon. There is simply no evidence suggesting that the shooting was part of a single, continuing, uninterrupted sequence of conduct.

Rather than proving an uninterrupted sequence of conduct, the evidence shows the criminal intent behind the conduct abruptly shifted from abduction to killing as the events progressed. While the kidnapping and the murder did occur within a short period of time from one another, Alway certainly had time to pause, reflect, and proceed to form a new intent after the kidnapping began, especially when violence of the brutal assault caused Barry to complain about the noise. The evidence reasonably supports the trial court's conclusion that the murder and kidnapping involved separate criminal intents.

Given this evidence, we hold that the trial court did not abuse its discretion or misapply the law when it determined that Alway's first degree murder and first degree kidnapping convictions involving Brandon were separate and distinct conduct. Therefore, the trial court did not err in sentencing Alway to consecutive sentences for the offenses under RCW 9.94A.589(1)(b).

IV. JUDGMENT AND SENTENCE

Alway argues the trial court erred in imposing the $250 jury demand fee and the $100 DNA collection fee. The State concedes the trial court under the particular circumstances of this case

committed scrivener's errors in imposing both fees.[5] We accept the State's concession and remand to the trial court to strike the $250 jury demand fee and the $100 DNA collection fee.

## V. STATEMENT OF ADDITIONAL GROUNDS (SAG)[6]

In his SAG, Alway raises five grounds for relief. We reject each ground.

### A. DOUBLE JEOPARDY

Alway claims the trial court violated his double jeopardy protections when it sentenced him to serve his sentence consecutively with two previous sentences from prior convictions (the sentences for which he claims to have already served). We disagree.

Double jeopardy protects a defendant from multiple punishments for the same offense. *Harris v. Charles*, 171 Wn.2d 455, 467, 256 P.3d 328 (2011). " 'The double jeopardy clause does not prohibit the imposition of *separate punishments* for *different offenses*.' " *State v. Arndt*, 194 Wn.2d 784, 817, 453 P.3d 696 (2019) (quoting *State v. Noltie*, 116 Wn.2d 831, 848, 809 P.2d 190 (1991)), *cert. denied*, 142 S. Ct. 726 (2021).

A trial court has discretion to impose consecutive sentences for felonies committed subsequent to other felonies under RCW 9.94A.589(3), as long as it expressly so orders. *State v. Champion*, 134 Wn. App. 483, 488, 140 P.3d 633 (2006), *review denied*, 160 Wn.2d 1006, *cert. denied*, 552 U.S. 1000 (2007). The statute states,

---

[5] A scrivener's error is a clerical mistake that, when amended, would correctly convey the trial court's intention as expressed in the record at trial. *State v. Snapp*, 119 Wn. App. 614, 627, 82 P.3d 252, *review denied*, 152 Wn.2d 1028 (2004). The remedy for a scrivener's error in a judgment and sentence is to remand to the trial court for correction. *State v. Makekau*, 194 Wn. App. 407, 421, 378 P.3d 577 (2016).

[6] RAP 10.10.

> [W]henever a person is sentenced for a felony that was committed while the person was not under sentence for conviction of a felony, the sentence shall run concurrently with any felony sentence which has been imposed by any court in this or another state or by a federal court subsequent to the commission of the crime being sentenced unless the court pronouncing the current sentence expressly orders that the confinement terms be served consecutively to each other.

RCW 9.94A.589(3).

In other words, when (1) a defendant commits a felony (and is not then under a felony sentence), (2) is subsequently sentenced for a separate felony, and *then* (3) the defendant is sentenced on the original felony, the sentences shall run concurrently *unless the sentencing court expressly orders* the terms to be served consecutively.

Here, the trial court sentenced Alway to 850 months confinement for Brandon's murder, to run consecutively with two previous convictions for second degree robbery[7] and possession of a stolen vehicle and unlawful possession of a firearm.[8] Because the record does not include the sentencing dates for all of these convictions, we cannot determine the application of RCW 9.94A.589(3).[9] The record is also insufficient for us to determine whether, and to what extent, Alway had already served sentences for these previous convictions as alleged in his SAG.

However, what is clear from the record is that the trial court imposed separate punishments for separate offenses—double jeopardy is not implicated by Alway's sentence. *See Arndt*, 194 Wn.2d at 817. Alway's claim fails.

---

[7] Clark County cause number 15-1-02306-3.

[8] Clark County cause number 17-1-00899-1.

[9] The declaration of criminal history does not state the sentencing date for Alway's possession of a stolen vehicle conviction.

B. Officer Testimony

Alway further claims his right to a fair trial was violated when six police officers testified about his arrest for a stolen vehicle. He claims that (1) this testimony was inadmissible because it was unrelated to his current case, (2) the State committed prosecutorial misconduct for eliciting this testimony, and (3) he received ineffective assistance of counsel because his defense counsel failed to object to the officers' testimony. We disagree.

1. Inadmissible Evidence

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b). Evidence that is properly admitted does not deprive a defendant of their right to a fair trial. *State v. Yarbrough*, 151 Wn. App. 66, 87, 210 P.3d 1029 (2009).

Six police officers testified at trial, without objection, about their arrest of Alway and Berry for a stolen vehicle. The officers testified that they became involved in the Brandon murder investigation because the sheriff's office contacted them regarding Alway's arrest and the handgun in his possession.

This testimony was admissible. It illustrated the sequence of events that led to the arrest of Alway and the discovery of the gun that was used to kill Brandon. The testimony also established the chain of custody of the evidence between Alway's arrest, turning the gun over to the sheriff's office, and the subsequent testing of the gun. Because these were legitimate purposes

21

for the admittance of this evidence and it was not used to show Alway's character under ER 404(b), its admissibility was not error.

2.  Prosecutorial Misconduct and Ineffective Assistance of Counsel

To prevail on a claim of prosecutorial misconduct, a defendant must first demonstrate that the prosecutor's conduct was improper and, second, that it was prejudicial. *Magers*, 164 Wn.2d at 191. As discussed above, the officers' testimony was admissible, therefore the State did not commit prosecutorial misconduct. For the same reasons, defense counsel's failure to object to the officer's testimony was not ineffective assistance of counsel.

C.  CUMULATIVE ERROR

Finally, Alway claims he is entitled to a new trial because his trial contained cumulative errors. Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair. *Emery*, 174 Wn.2d at 766.

Alway has not shown error, much less cumulative errors, and therefore, is not entitled to a new trial.

## CONCLUSION

We affirm Alway's convictions, but remand to the sentencing court to correct the two scrivener's errors.

No. 55793-2-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

GLASGOW, C.

LEE, J.